69 Cal.Rptr.3d 705 (2007)
158 Cal.App.4th 313
SAN DIEGO METROPOLITAN TRANSIT DEVELOPMENT BOARD, Plaintiff and Appellant,
v.
RV COMMUNITIES, Defendant and Respondent.
No. D042545.
Court of Appeal of California, Fourth District, Division One.
December 21, 2007.
*710 Best, Best & Krieger, Bruce W. Beach, San Diego, and Karen M. Freeman, for Plaintiff and Appellant.
Myers, Widders, Gibson, Jones & Schneider and Katherine E. Stone, Ventura, for League of California Cities and California State Association of Counties, as Amici Curiae on behalf of Plaintiff and Appellant.
Luce, Forward, Hamilton & Scripps, Charles A. Bird, San Diego; Gordon & Holmes, Frederic L. Gordon and Rhonda J. Holmes, San Diego, for Defendant and Respondent.
HUFFMAN, Acting P.J.
This is an eminent domain case involving partial condemnation of the defendant's land. In March 2005, we issued an opinion in which we decided, among other things, that the trial court properly changed the date of valuation of the condemned property from the date the plaintiff deposited probable compensation to the date of trial. The California Supreme Court granted review and transferred the case to us with directions to vacate our prior opinion and reconsider the cause in light of Mt. San Jacinto Community College District v. Superior Court (2007) 40 Cal.4th 648, 54 Cal. Rptr.3d 752, 151 P.3d 1166 (Mt. San Jacinto). Mt. San Jacinto is an eminent domain case in which the Supreme Court affirmed a Court of Appeal judgment directing the trial court to set the date of valuation as the date the plaintiff college district deposited probable compensation for the condemned property. Having reconsidered the matter, we conclude the decision in Mt. San Jacinto rests on facts that are distinguishable from those before us in this appeal. Based on the unique facts and circumstances of this case, we reaffirm our decision that the trial court did not err in setting the date of valuation as the date of trial.
Plaintiff San Diego Metropolitan Transit Development Board (MTDB) filed this appeal from a judgment in condemnation awarding defendant RV Communities (RV) compensation for property taken by eminent domain, additional property taken by inverse condemnation, a temporary construction easement, a drainage easement, and severance damage to its remaining property. In addition to contending the judgment should be reversed because the trial court erroneously changed the date of valuation from the date MTDB deposited probable compensation to the date of trial, MTDB contends the court committed reversible error by (1) allowing RVs inverse condemnation cross-action to proceed after MTDB filed its direct condemnation action and ordering MTDB to take additional property not specified in the resolution *711 of necessity; (2) admitting opinion evidence of severance damages that was not properly exchanged under Code of Civil Procedure[1] section 1258.810 et seq.; (3) admitting evidence of a specific plan of development and damages tied to the specific plan; (4) admitting evidence of MTDB's value engineering decisions during the planning phase of the project; (5) not excluding the testimony of RVs appraiser on the ground he failed to use or consider the "zones of value" methodology in reaching his value opinion; and (6) refusing to instruct the jury on the zones of value methodology.[2] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On September 13, 2001, MTDB adopted a resolution of necessity to acquire a portion of property owned by RV (the property) for construction of a trolley line known as the Mission Valley East Light Rail Transit Project (the project). RV was using the property as a recreational vehicle resort. MTDB determined it was necessary to acquire fee simple absolute title to 39,514 square feet of the property, a temporary construction and grading easement of 50,254 square feet, and a drainage easement of 5,478 square feet.
On September 18, 2001, MTDB filed its complaint in eminent domain. On September 27, MTDB deposited $79,357 as the probable amount of just compensation for the taking of RV's property. The amount of the deposit was based on a declaration by MTDB's real estate appraiser, James Brabant, stating his opinion of the property's value. On the same day, MTDB obtained an order for possession authorizing it to take possession of the condemned property in 90 days.
RV filed an answer to the eminent domain complaint in November 2001 and in February 2002, withdrew the $79,357 deposited by MTDB. In April the court set trial for August 23, 2002. In June MTDB filed an ex parte application to continue the trial date to April 4, 2003 or later. MTDB asserted RV would be unable to prove its claim for construction damages if trial commenced in August because the impact of the project construction on RVs recreational vehicle park and its tenants would not be known until a majority of the construction was complete in April 2003. The court continued the trial date to January 10, 2003 and granted RV leave to file an amended answer and cross-complaint.
RV filed a first amended answer and a cross-complaint asserting causes of action for temporary severance damages, de facto temporary taking by inverse condemnation, de facto permanent taking by inverse condemnation, and pre and post condemnation delay. In both the amended answer and cross-complaint, RV alleged that MTDB's actions caused a permanent taking of the area of the temporary construction easement.
MTDB filed a demurrer to the cross-complaint, asserting that each of RV's causes of action "must be asserted by way of a properly pleaded answer [to the eminent domain complaint], not through a separate cross-complaint." The court overruled *712 the demurrer and MTDB filed an answer to the cross-complaint.
MTDB moved to bifurcate the cross-complaint issues of liability for precondemnation damages and de facto taking, which were to be tried by the court, from the jury issue of just compensation. Before the hearing date on the motion, MTDB filed an ex parte application to set the trial of precondemnation damages and defenses for January 10, 2003 and the jury trial on valuation at least two months later. At the ex parte hearing the court ordered the requested bifurcation and advanced the court trial date to December 13, 2002.
The parties exchanged lists of expert witnesses and statements of valuation data. On the December 13 trial date, RV dropped all of its causes of action against MTDB except the cause of action for inverse condemnation. The court deemed the first phase of the trial complete, but deferred the issue of whether the "temporary construction easement [plus] a remnant constitutes a taking" to the "phase II valuation" trial. The court scheduled the second phase of the trial to begin on February 28, 2003.
Shortly before the February 28 trial date, RV filed a motion to increase MTDB's deposit of probable compensation to $300,300 and to change the date of value from the date of deposit (September 27, 2001) to the date of trial (February 28, 2003). On February 18, before the motion was heard, MTDB voluntarily deposited an additional $220,643 as probable compensation. On February 21, the court granted RVs motion as to both requests.
After a bench trial on RVs inverse condemnation claim, the court ruled that MTDB had inversely condemned a 20,100 square foot area of the property "representing the toe of the eastern slope" (referred to by RV as the "Eastern Slope Toe"). The inversely condemned area consisted of 12,400 square feet of land within MTDB's temporary construction easement and 7,700 square feet of land that was not within any of MTDB's take areas.
After the court issued its inverse condemnation ruling, the valuation issues were tried to a jury. The jury returned a special verdict finding the following fair market values for the interests taken by MTDB: $1,132,866 for the directly condemned land taken in fee simple absolute; $576,267 for the land taken in fee simple absolute by inverse condemnation; $139,944 for the temporary construction easement; and $78,527 for the drainage easement. The jury also found severance damages of $470,000 and no benefits to RVs remaining property. The court entered a judgment in condemnation consistent with the jury's verdict. MTDB filed its notice of appeal after unsuccessfully moving for a new trial.

DISCUSSION

I
CHANGE OF THE DATE OF VALUATION FROM THE DATE OF DEPOSIT OF PROBABLE COMPENSATION TO THE DATE OF TRIAL
MTDB and amici curiae contend the court committed reversible error by changing the date of valuation of the condemned property from the date MTDB deposited probable compensation in the amount of $79,357 to the date of trial.
Under the California Constitution, "[w]hen the government exercises its power of eminent domain, and condemns or damages private property for public use, it must pay `just compensation' to the owner. [Citation.] The just compensation is aimed at making the landowner whole for a governmental taking or damage to *713 the owner's property. [Citations.] In other words, `"the owner is entitled [to] the full and perfect equivalent of the property taken."' [Citations.]" (Mt. San Jacinto, supra, 40 Cal.4th at p. 653, 54 Cal.Rptr.3d 752,151 P.3d 1166, fn. omitted.)[3]
Mt. San Jacinto noted that under California's statutory eminent domain law (§ 1230.010 et seq.), "if the compensation issue `is brought to trial within one year after commencement of the proceeding, the date of [property] valuation is the date of commencement of the proceeding.' (§ 1263.120.) The condemner may, however, take early possession of the property before litigation is concluded `upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.' (Cal. Const., art. I, § 19; see § 1255.410.) The immediate possession procedure is also known as a `quick-take' eminent domain action. [Citation.] Because compensation is immediately available to the property owner in a quick-take action, the date of valuation of the property is statutorily required to be no later than the date the condemner deposits `probable compensation' for the owner. (§ 1263.110 et seq.) The deposit earns statutory interest until it is withdrawn. (§ 1268.310.) The property owner can immediately withdraw the funds, but by doing so waives all rights to dispute the taking other than the right to challenge the amount of just compensation. (§ 1255.260.)" (Mt. San Jacinto, supra, 40 Cal.4th at p. 653, 54 Cal.Rptr.3d 752, 151 P.3d 1166.)
California's eminent domain law includes a number of "statutory procedural safeguards" that are designed to ensure that a quick-take deposit "closely approximates the amount that a jury would actually award [for the condemned property]" (Mt. San Jacinto, supra, 40 Cal.4th at p. 660, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) One such safeguard is that at any time after a deposit is made, the plaintiff or any other party with an interest in the property can bring a motion requesting the court to "determine or redetermine whether the amount deposited is the probable amount of compensation that will be awarded in the proceeding." (§ 1255.030, subd. (a).) If the court determines the probable amount of compensation exceeds the amount deposited, the court can order the amount deposited to be increased. (§ 1255.030, subds. (b) and (c).)
In Mt. San Jacinto, the plaintiff college district filed an eminent domain action against the defendant university, seeking to condemn 30 acres of vacant land. In December 2000, the plaintiff deposited $1,789 million into court as probable compensation for the condemned property and supported the deposit with an appraisal as required under section 1255.010. In February 2002, the defendant petitioned the trial court under section 1255.030 to increase the amount of the deposit, and the court found the amount deposited was sufficient. (Mt. San Jacinto, supra, 40 Cal.4th at pp. 654-655, 662, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) However, in ruling on pretrial cross-motions in limine to determine the date of valuation, the trial court *714 ruled that the property should be valued as of the date trial commenced in December 2004, almost four years after the date the plaintiff deposited probable compensation. (Id. at p. 655, 54 Cal.Rptr.3d 752, 151 P.3d 1166.)
The plaintiff challenged that ruling by petition for writ of mandate and the Court of Appeal granted the petition, finding that the property owner had received just compensation on the date of deposit. (Mt. San Jacinto, supra, 40 Cal.4th at p. 656, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) The Supreme Court affirmed the Court of Appeal, concluding generally that "the statutory date of valuation at the time probable compensation is deposited is constitutional...." (Id. at p. 654, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) Considering the facts before it, the Supreme Court held: "Where, as here, a deposit of probable compensation is made, and the trial court determines that the deposit equals or exceeds the probable amount of the owner's just compensation, the property must be valued on the date of the deposit. [Citation.]" (Id. at p. 666, 54 Cal.Rptr.3d 752, 151 P.3d 1166.)[4]
The question we must presently decide is whether under Mt. San Jacinto, the trial court here committed reversible error by changing the date of valuation from the date MTDB deposited probable compensation to the date trial commenced. Notwithstanding Mt. San Jacinto analysis of the constitutionality of California's quick-take statutes and its application of those statutes to the facts before it, we conclude the trial court in this case did not err by changing the date of valuation. Mt. San Jacinto held that condemned property is properly valued on the date of deposit when "a deposit of probable compensation is made, and the trial court determines that the deposit equals or exceeds the probable amount of the owner's just compensation...." (Mt. San Jacinto, supra, 40 Cal.4th at p. 666, 54 Cal.Rptr.3d 752, 151 P.3d 1166, italics added.) Mt. San Jacinto is distinguishable from the instant case because here it is undisputed that MTDB's deposit was substantially less than the probable amount of RVs just compensation for the condemned property.
MTDB deposited $79,357 as probable compensation in September 2001 and obtained an order for possession of the directly condemned property. The amount of the deposit was based on the declaration of real estate appraiser James Brabant stating that his "opinion of the value for the property as of the date of value is $79,357." The appraisal summary accompanying Brabant's declaration specified April 26, 2001 as the date of value. Under section 1263.110, the date of value should have been September 27, 2001, the date of the probable compensation deposit. In November 2002, Brabant prepared a revised "Statement of Valuation Data" in which he stated the date of valuation was September 27, 2001 and fair market value of the acquired property was $300,300. In deposition, Brabant testified that the difference between his original appraisal and updated appraisal was partly due to the increase in property values between April and September of 2001, but was mainly due to substantial changes in the data he was provided as the basis for his appraisal
*715 In February 2003, RV filed a motion to increase the deposit of probable compensation to at least $300,300 under section 1255.030 and to set the date of valuation as the date of trial. Relying on Saratoga Fire Protection Dist. v. Hackett (2002) 97 Cal.App.4th 895, 118 Cal.Rptr.2d 696 (Saratoga ), RV argued the court had the authority to change the date of valuation where the original statutory date would not result in constitutionally required just compensation for condemned property. RV additionally argued that the date of valuation should not be the date of MTDB's "probable compensation" deposit because the amount MTDB deposited was not probable compensation. In its opposition to the motion, MTDB objected to changing the date of valuation but did not address RVs request to increase the deposit. A week after filing its opposition, MTDB voluntarily deposited an additional $220,643 as probable compensation.
Citing Saratoga, supra, 97 Cal.App.4th 895, 118 Cal.Rptr.2d 696, the court ruled that "the date of the trial is the proper date of valuation if the Constitutional requirements of just compensation are to be met." We conclude the court's ruling was correct.
In Saratoga, the statutory date of valuation for property condemned by the plaintiff fire district was the date the eminent domain complaint was filed because the action was brought to trial within one year of that date (§ 1263.120) and the plaintiff had not deposited probable compensation. The parties stipulated that the property was worth $2 million on that date, but the defendant property owner obtained appraisals stating that the property was worth over $3 million about a month before the trial date. (Saratoga, supra, 97 Cal.App.4th at p. 898, 118 Cal.Rptr.2d 696.) At trial, the court granted the plaintiffs motion to exclude any evidence of the property's value other than the stipulated value at the time the eminent domain complaint was filed. (Ibid.) On appeal, the defendant successfully argued that the eminent domain statutes were unconstitutional as applied to him because they do not provide for just compensation when a condemned property's value substantially increases before trial. (Id. at p. 899, 118 Cal.Rptr.2d 696.)
The Saratoga court noted that both the United States Supreme Court and California courts have recognized that strict adherence to the statutory valuation date in an eminent domain action is improper if the resulting compensation to the property owner falls substantially short of constitutionally required "just compensation." Saratoga quoted Kirby Forest Industries, Inc. v. United States (1984) 467 U.S. 1, 17, 104 S.Ct. 2187, 81 L.Ed.2d 1, in which the United States Supreme Court stated that "`[h]owever reasonable it may be to designate the date of trial as the date of valuation, if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the United States tenders payment, it violates the Fifth Amendment.'" (Saratoga, supra, 97 Cal.App.4th at p. 903, 118 Cal.Rptr.2d 696.) Saratoga also quoted Redevelopment Agency v. Gilmore (1985) 38 Cal.3d 790, 799, footnote 9, 214 Cal.Rptr. 904, 700 P.2d 794 (Gilmore) in which the California Supreme Court observed that the Kirby court "`recognized that any substantial increase in fair market value between the dates of valuation and taking must be paid in order to provide "just compensation." Thus, the condemnee in a federal proceeding may move, after the taking, to amend the award in order to litigate the issue of interim increase in fair market value. [Citation.]'" (Saratoga, supra, 97 Cal.App.4th at p. 903, 118 Cal.Rptr.2d 696.) Saratoga also quoted the following statement from Community *716 Redevelopment Agency v. Force Electronics (1997) 55 Cal.App.4th 622, 633, 64 Cal.Rptr.2d 209: "`At least since Gilmore it has been the law in California that state statutory provisions must fail if they conflict with this constitutional requirement. "This element of `just compensation' is constitutionally required and `cannot be made to depend upon state statutory provisions.' " [Citation.]'" (Saratoga, supra, 97 Cal.App.4th at p. 903, 118 Cal.Rptr.2d 696.)
Saratoga noted that in Citizens Utilities Co. v. Superior Court (1963) 59 Cal.2d 805, 31 Cal.Rptr. 316, 382 P.2d 356, the California Supreme Court decided the trial court had the inherent power to change a valuation date from the date of summons to the date of trial, stating: "`The provision of the Constitution compelling payment of just compensation for a public taking of property [citation] is self-executing. Since this is so it has consistently been held, in inverse condemnation cases, that inherent power is reposed in the trial court to provide for the assessment of just compensation in situations not within the purview of existing statutory provisions.'" (Saratoga, supra, 97 Cal.App.4th at p. 904, 118 Cal.Rptr.2d 696, quoting Citizens Utilities Co. v. Superior Court, supra, 59 Cal.2d at p. 812, 31 Cal.Rptr. 316, 382 P.2d 356.)
Finally, Saratoga set forth the following language from People ex ret. Dept. of Transportation v. Southern Cal. Edison Co. (2000) 22 Cal.4th 791, 798-799, 94 Cal. Rptr.2d 609, 996 P.2d 711: `"Ordinarily, the literal meaning of the words of a statute governs. [Citation.] We will not, however, apply the literal language of a statute "when to do so would evidently carry the operation of the enactment far beyond the legislative intent and thereby make its provisions apply to transactions never contemplated by the legislative body." [Citation.] "A code may strive for comprehensiveness, but exceptional situations will arise." [Citation.] As a result, we may decline to apply a statute in those rare cases where "it is obvious that the Legislature cannot have intended the statute to apply." [Citation.] [H] These principles of statutory construction are especially germane in the eminent domain context because "the amount to be paid for property taken by the government is, under the Constitution, a matter for the courts rather than the Legislature...." [Citation.] Thus, courts have eschewed a literal application of our eminent domain statutes if such an application "ignores" the purpose behind the statutes. [Citation.] Courts have also found one of these statutes inapplicable where the Legislature did not anticipate the particular facts of the case and undoubtedly did not intend for the statute to apply there. [Citation.] Finally, courts have refused to apply our eminent domain statutes where their application would give the condemnee a "`windfall'" not intended by the Legislature. [Citations.]'" (Saratoga, supra, 97 Cal.App.4th at p. 905, 118 Cal.Rptr.2d 696.)
Saratoga concluded that the trial court should have allowed the defendant in that case to present evidence of "unusual circumstances which, if believed, . . . would make it unjust to apply section 1263.120 to defendant's award.... Just as the rules are not to be applied to give the condemnee a `windfall,' [citation], they should not be applied to give the government a windfall. [Citation.] Thus, section 1263.120`like "all condemnation law, procedure and practice[]is but a means to the constitutional end of just compensation to the involuntary seller, the property owner." [Citation.]' [Citation.]" (Saratoga, supra, 97 Cal.App.4th at p. 906, 118 Cal.Rptr.2d 696.)
*717 MTDB and amici curiae argue that Saratoga, supra, 97 Cal.App.4th 895, 118 Cal. Rptr.2d 696, is distinguishable because the condemning authority there did not deposit probable compensation as MTDB did here. Mt. San Jacinto similarly focused on the fact that Saratoga was not a quick-take case in distinguishing it from the case before it, stating: "[I]t is of critical importance that Saratoga was a straight condemnation proceeding where there was no deposit of probable compensation before trial. In order to provide just compensation, the court in Saratoga had to value the property closer to when payment would finally be made available to the owner. Section 1263.120 had to be disregarded to ensure the owner received just compensation at the time payment was tendered and the property was actually taken. [¶] In contrast to the condemnor in Saratoga, the [plaintiff] here deposited the probable amount of compensation well before the start of trial.... The deposit was supported by an appraisal as required under section 1255.010. Indeed, when the [defendant] made a motion under section 1255.030 to increase the amount of the deposit, the trial court found that the amount deposited was sufficient." (Mt. San Jacinto, supra, 40 Cal.4th at pp. 661-662, 54 Cal.Rptr.3d 752, 151 P.3d 1166, italics added.)
Here, MTDB did not make a sufficient deposit of probable compensation; the amount of its initial deposit was less than one-third the correct amount of probable compensation. Thus, for purposes of determining the proper date of valuation, this case is more akin to Saratoga, supra, 97 Cal.App.4th 895, 118 Cal.Rptr.2d 696, in which there was no deposit of probable compensation before trial, than to Mt. San Jacinto, supra, 40 Cal.4th 648, 54 Cal. Rptr.3d 752, 151 P.3d 1166, in which there was a sufficient deposit of probable compensation.[5]
Mt. San Jacinto reaffirmed the principle that "[t]he owner's constitutional right to receive just compensation for the property `"cannot be made to depend upon state statutory provisions."' [Citations.]" (Mt. San Jacinto, supra, 40 Cal.4th at p. 660, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) "[S]tate and federal statutory provisions have been invalidated when necessary to ensure just compensation to the owner. [Citations.]" (Ibid.) "`"[A]ll condemnation law, procedure and practice ... is but a means to the constitutional end of just compensation to the involuntary seller, the property owner."` [Citation.] Put another way, just compensation is the `overriding principle' that applies in eminent domain law. [Citation.]" (Escondido Union School Dist. v. Casa Suenos De Oro, Inc. (2005) 129 Cal.App.4th 944, 959, 29 Cal.Rptr.3d 89.) Accordingly, if under the circumstances of a particular case, using the valuation date prescribed by law for condemned property will not satisfy the constitutional requirement of just compensation, the court has inherent authority to *718 use a valuation date that will satisfy that constitutional requirement.
Under the unique circumstances of this case, the court's ruling changing the valuation date to the date of trial comported with, the constitutional requirement of just compensation. Preliminarily, RV persuasively argues that the change in valuation date did not contravene the statutory scheme. According to Brabant, MTDB's own appraiser, the amount of probable compensation that should have been deposited in September 2001 was $300,300 rather than the $79,357 that MTDB deposited. Section 1263.110 provides that "if the plaintiff deposits the probable compensation ... the date of valuation is the date on which the deposit is made." (Italics added.) Under the plain meaning of the statute, the amount MTDB deposited in September 2001 did not set the date of valuation because, according to MTDB's own updated valuation data, it fell short of "probable compensation." Consequently, the proper statutory date of valuation was the time of trial under section 1263.130,[6] because the issue of compensation was not brought to trial within one year of commencement of the eminent domain proceeding and the delay was not caused by RV.
In any event, under Saratoga, supra, 97 Cal.App.4th 895, 118 Gal.Rptr.2d 696, and the case law on which it relied, the court properly changed the date of valuation to the date of trial to satisfy the constitutional requirement of just compensation. Because a landowner is permanently deprived of all rights in condemned property when the condemnor deposits probable compensation and obtains early possession of the property, a constitutional taking occurs at that time. (Gilmore, supra, 38 Cal.3d at p. 801, 214 Cal.Rptr. 904, 700 P.2d 794.) "Accordingly, `just' compensation is the `full and perfect' monetary equivalent of the fair market value of the land paid at the time the taking occurred. [Citation.]" (Ibid., italics added.)
An obvious purpose of the simultaneous exchange of probable compensation for condemned property is to enable the condemnee to obtain similar or comparable replacement property of approximately equivalent value in the same market. Addressing the interest to be paid a condemnee when payment of an eminent domain award is delayed, Gilmore observed that "[w]hen the delay occurs during times of inflationary market interest rates which substantially exceed the statutory rate, application of the lower statutory limit denies the condemnee `the full equivalent of the [property's] value ... at the time of taking paid contemporaneously with the taking.'" (Gilmore, supra, 38 Cal.3d at p. 797, 214 Cal.Rptr. 904, 700 P.2d 794, quoting Phelps v. United States (1927) 274 U.S. 341, 344, 47 S.Ct. 611, 71 L.Ed. 1083.) Similarly, delay in the payment of the correct amount of probable compensation after the condemnor obtains possession of condemned property in a rapidly inflating real estate market denies the condemnee the full equivalent of the property's value paid contemporaneously with the taking and, thus, the ability to invest the money paid in other property of equal value in the same market.
Mt. San Jacinto noted that over 50 years ago, the California Law Revision Commission, in a study recommending certain *719 changes to California's eminent domain law, stated: "`A person's property should not be taken from him unless he has the right to be paid concurrently for the property, for it is at the time of the taking that he must meet the expenses of locating and purchasing property to replace that taken and of moving to a new location.' [Citation.]" (Mt. San Jacinto, supra, 40 Cal.4th at p. 658, 54 Cal.Rptr.3d 752, 151 P.3d 1166, italics added.) MTDB's deposit of $79,357 was insufficient to enable RV to buy comparable property at the time of the deposit, and by the time MTDB raised the amount of the deposit, it was undisputed that property values had increased.
MTDB contends that under the statutory schemesection 1255.030 in particularand Mt. San Jacinto, supra, 40 Cal.4th 648, 54 Cal.Rptr.3d 752, 151 P.3d 1166, the initial date it deposited probable compensation is the proper date of valuation because it voluntarily increased the amount of its probable compensation deposit in response to RVs motion to increase the deposit. MTDB argues that under section 1263.110, subdivision (b), only if the probable compensation deposit is not increased in the time allowed by the trial court in granting a property owner's motion to increase the deposit under section 1255.030 can the date of valuation be set as if no deposit of probable compensation has been made.
As Mt. San Jacinto noted, one of the procedural safeguards that ensures a deposit of probable compensation will be constitutionally sufficient is the property owner's right to petition the court under section 1255.030, subdivision (a) to "determine or redetermine" whether the amount of the deposit equals the probable compensation that will be awarded. (Mt. San Jacinto, supra, 40 Cal.4th at p. 660-661, 54 Cal.Rptr.3d 752, 151 P.3d 1166.) However, Mt. San Jacinto did not address whether the constitutional requirement of just compensation may require changing the date of valuation from the date of the deposit to the date trial commences when it is determined well after the deposit date (on a motion to increase the deposit under section 1255.030 or otherwise) that the amount of the deposit was far short of the probable compensation the defendant property owner would recover at trial, and was clearly insufficient to enable the property owner to use the deposit to purchase comparable property in the current market. This issue was not raised in Mt. San Jacinto because the trial court in that case found the amount of the deposit was sufficient.
"Whatever other rights he has or lacks, a landowner is constitutionally entitled to compensation reasonable under market conditions for any lost use of money arising from a delay between the taking of his property and full payment." (Gilmore, supra, 38 Cal.3d at p. 801, 214 Cal. Rptr. 904, 700 P.2d 794.) RV effectively was denied use of a substantial portion of the probable compensation it should have received at the time MTDB took possession of the property and by the time MTDB voluntarily increased the probable compensation deposit, RV had lost the ability to exchange the deposit for similar property in the current market.[7] We conclude *720 that changing the valuation date of the property to the time of trial was a proper remedy for the lost use of that money, as it allowed the jury to determine reasonable compensation in light of the market conditions that existed between the taking of the property and full payment for the taking. The court did not abuse its inherent power to change the statutory valuation date to satisfy the constitutional requirement of just compensation.

II
ALLOWANCE OF RVS INVERSE CONDEMNATION CROSS-ACTION AFTER MTDB FILED A DIRECT EMINENT DOMAIN ACTION
MTDB contends the trial court should not have allowed RVs inverse condemnation cross-action to proceed because it was based on the same property that was the subject of MTDB's direct condemnation action. As authority for that contention, MTDB cites Richmond Redevelopment Agency v. Western Title Guaranty Company (1975) 48 Cal.App.3d 343, 351, 122 Cal. Rptr. 434 (Richmond), in which the Court of Appeal, applying former eminent domain statutes, held that a property owner's inverse condemnation cross-complaint was properly struck because it sought the same type of damages the property owner was required to seek by answer to the direct condemnation complaint and would have obtained as part of the eminent domain award.
Richmond was decided under now obsolete eminent domain statutes that required the defendant property owner to allege the amount of damages claimed by reason of the taking in the answer to the eminent domain complaint.[8]Richmond concluded the inverse condemnation cross-complaint was properly struck because "`[t]he clear implication from the provisions which enable [the defendant to present any claims for damages caused by the taking] by answer is that no cross-complaint is to be filed for the same purpose.' [Citation.]" (Richmond, supra, 48 Cal.App.3d at p. 351, 122 Cal.Rptr. 434, quoting People v, Buellton Development Co., supra, 58 Cal.App.2d at pp. 183-184, 136 P.2d 793, italics added by Richmond.) Under the current statutory scheme, the only requirement that damages be specifically claimed by answer to an eminent domain complaint is that when the defendant seeks compensation for loss of goodwill, the answer must specifically state that the defendant claims compensation under section 1263.510 (the statute governing compensation for loss of goodwill), but the amount of such damage does not have to be alleged. (§ 1250.320.) Because the current eminent domain statutes do not require defendants to allege the amount claimed as damages by reason of the taking in the answer, Richmond is *721 dubious authority for MTDB's position that RVs inverse condemnation cross-complaint is procedurally barred.
MTDB argues that RVs inverse condemnation cross-complaint is barred by section 1245.260, subdivision (c), which provides:
"A public entity may commence an eminent domain proceeding or rescind a resolution of necessity as a matter of right at any time before the property owner commences an [inverse condemnation] action under this section. If the public entity commences an eminent domain proceeding or rescinds the resolution of necessity before the property owner commences an [inverse condemnation] action under this section, the property owner may not thereafter bring an [inverse condemnation] action under this section."
This provision does not bar RVs inverse condemnation cross-complaint because RVs cross-action was not an inverse condemnation action brought under section 1245.260. When a public entity initiates the eminent domain process by adopting a resolution of necessity to condemn property but does not commence an eminent domain proceeding to acquire the property within six months after adopting the resolution, or commences an eminent domain proceeding but does not diligently attempt to serve the summons and complaint on the property owner within six months of commencing the action, section 1245.260, subdivision (a) allows the property owner to bring an inverse condemnation action to require the public entity to take and pay compensation for the property and/or to pay damages for any interference with the owner's possession and use of the property resulting from adoption of the resolution. Under section 1245.260, subdivision (c), the property owner loses the right to bring an inverse condemnation action "under this section"i.e., under section 1245.260, subdivision (a)if the public entity first commences an eminent domain proceeding or rescinds the resolution of necessity. In short, subdivision (c) allows the public entity to avoid an inverse condemnation action under subdivision (a). Section 1245.260, subdivision (c) does not apply here because RVs inverse condemnation action was not brought under section 1245.260, subdivision (a); it was brought to recover compensation for alleged property takings not covered by MTDB's resolution of necessity and direct action. Nothing in section 1245.260 precludes a defendant property owner in an eminent domain action from filing and prosecuting an inverse condemnation cross-complaint seeking compensation for alleged takings that are not addressed by the eminent domain complaint.
The following statement by the California Law Revision Commission reflects the Legislature's intent to limit section 1245.260, subdivision (c)'s preclusion of inverse condemnation actions to those brought under section 1245.260, subdivision (a): "Subdivision (c) makes clear that the public entity can commence an eminent domain proceeding or rescind the resolution of necessity at any time prior to the commencement of the [inverse condemnation] action and thereby avoid liability under subdivision (a). This provision does not, however, affect the owner's right to bring an inverse condemnation action based on Article I, Section 19, of the California Constitution." (Cal. Law Revision Com. com., 19 West's Ann.Code Civ. Proc. (2007 ed.) foll. § 1245.260, p. 440, italics added.) In other words, the public entity's commencement of an eminent domain proceeding does not preclude the property owner from bringing an inverse condemnation action based on the general constitutional requirement of just compensation for governmental taking of private property; *722 it precludes only inverse condemnation actions brought under section 1245.260, subdivision (a) to remedy governmental delay in proceeding with eminent domain proceedings after adopting a resolution of necessity.
Amici curiae argue the inverse condemnation cross-complaint should not have been allowed because the damages it sought were severance damages that could have been recovered in the direct action. Amici curiae rely, in part, on Taper v. City of Long Beach (1982) 129 Cal.App.3d 590, 181 Cal.Rptr. 169, in which the appellate court decided that since it was reversing judgments in both an eminent domain action and inverse condemnation action and, therefore, the direct action would proceed, the property owner's damages for diminution in the property's value attributable to the City's unreasonable delay and other oppressive precondemnation conduct had to be recovered in the direct action. (Id. at pp. 610-611, 181 Cal.Rptr. 169.) The court supported this conclusion with a "see" citation to four cases, including Richmond, supra, 48 Cal.App.3d 343, 122 Cal. Rptr. 434 which is distinguished above. The other three are Klopping v. City of Whittier (1972) 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (Klopping); People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc. (1979) 91 Cal.App.3d 332, 153 Cal.Rptr. 895 (Peninsula Enterprises); and People ex rel. Dept. Pub. Wks. v. Southern Pac. Trans. Co. (1973) 33 Cal. App.3d 960, 109 Cal.Rptr. 525 (Southern Pac. Trans. Co.).
Klopping held that as between a city's eminent domain action and an inverse condemnation action involving the same property, the case that proceeds to judgment first is res judicata as to issues common to both actions and bars recovery in the other action of any damages that were or could have been recovered in the action that proceeded to judgment first. (Klopping, supra, 8 Cal.3d at p. 58, 104 Cal.Rptr. 1, 500 P.2d 1345.) Klopping observed: "Had the city abandoned its condemnation action for a significant period of time so that the inverse condemnation action proceeded to judgment first, any recovery there would bar a duplicate award for the same damage when eminent domain proceedings were subsequently reinstituted." (Ibid.) Klopping does not support the proposition that an inverse condemnation action cannot coexist with an eminent domain action involving the same property, as its holding contemplates both actions pending simultaneously and either one going to judgment first.
Peninsula Enterprises cited Richmond, supra, 48 Cal.App.3d 343, 122 Cal.Rptr. 434 for the rule that "that when an eminent domain action has been commenced by a public entity, the proper method for the condemnee to seek damages for the entity's unreasonable precondemnation delay is by way of answer and not by way of cross-complaint[ because] in such circumstances the precondemnation damages constitute part of the eminent domain award." (Peninsula Enterprises, supra, 91 Cal. App.3d at p. 353, 153 Cal.Rptr. 895.) However, as discussed above, Richmond applied former eminent domain statutes that required a property owner to specifically allege the damages claimed by reason of a direct taking in the answer to the eminent domain complaint. In any event, Peninsula Enterprises is inapposite because RV did not seek damages for unreasonable precondemnation delay in its inverse condemnation cause of action.
Southern Pac. Trans. Co. involved "an improper zoning restriction imposed by the City of Los Angeles for the purpose of depressing value with a view to future condemnation, and actual condemnation by a different governmental agency, the State *723 of California." (Southern Pac. Trans. Co., supra, 33 Cal.App.3d at p. 966, 109 Cal. Rptr. 525.) The Court of Appeal noted that such an improper zoning restriction "creates a cause of action in inverse condemnation against the governmental unit enacting the zoning ordinance. [Citations.]" (Ibid.) The court further observed that when the governmental entity that enacts such an invalid zoning ordinance is also the condemnor, "[i]t is practical and logical to require that such invalid zoning be disregarded...." (Ibid.) The court reasoned: "Permitting recovery in eminent domain disregarding the zoning restriction combines in one action the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property. The process avoids separating the matter into two causes involving the same subject matter and the same parties. Moreover, the condemning authority is also the zoning government so that much of the vice of a collateral attack on zoning in the usual eminent domain proceeding is not present." (Ibid.)
Southern Pac. Trans. Co., supra, 33 Cal. App.3d 960, 109 Cal.Rptr. 525 does not support a general rule prohibiting an inverse condemnation cross-complaint in a direct eminent domain action. Its single-action analysis, which is limited to the specific invalid zoning issue before it, simply supports the principle that separating a matter into two causes involving the same subject matter and the same parties should be avoided if possible. The instant case does not involve an invalid zoning ordinance and the entire "matter" (complaint and cross-complaint) was adjudicated in a single proceeding.
The amici curiae and MTDB argue that the court cannot determine what property the public entity should take by eminent domain or compel the public entity to take more than is necessary for the public project. However, in adjudicating RVs inverse condemnation cross-action, the court did not determine what property MTDB was required to take by eminent domain for the project; it simply decided what additional property MTDB inversely condemned. We are aware of no California case applying the current eminent domain statutes that expressly precludes RVs inverse condemnation cross-complaint. We conclude the court properly allowed RVs cross-action to proceed.
We note that in the "Factual and Procedural Background" section of MTDB's argument regarding the propriety of RVs inverse condemnation cross-complaint, MTDB asserts that "[t]he evidence introduced in favor of RVs inverse condemnation claim does not support the trial court's ruling." This statement and much of MTDB's ensuing discussion suggests the argument that the court's inverse condemnation finding is not supported by substantial evidence. We deem that argument waived because it is not stated under a separate heading or subheading or supported by citation to legal authority as required by California Rules of Court, rule 8.204(a)(1)(B). (Opdyk v. California Horse Racing Bd. (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4, 41 Cal.Rptr.2d 263; Heavenly Valley Ski Resort v. El Dorado County Bd. of Equalization (2000) 84 Cal. App.4th 1323, 1345, fn. 17, 1346, 101 Cal. Rptr.2d 591.)
In any event, the argument is without merit because the inverse condemnation finding is sufficiently supported by the testimony of RVs civil engineering expert Eric Armstrong that it was not physically feasible to construct within the area of the property the court found to be inversely condemned. MTDB poses various challenges to Armstrong's testimony *724 that are largely based on MTDB's counsel's cross-examination of Armstrong and its own expert's criticism of Armstrong's opinions. However, these challenges go to the weight rather than admissibility of Armstrong's opinion testimony. The court, who visited the site at the beginning of the inverse condemnation phase of trial, could reasonably accept Armstrong's conclusion that RV would be unable to develop the 20,100 square foot area the court found to be inversely condemned.

A. RVs Withdrawal of Funds on Deposit in February 2003
MTDB contends that RV waived the right to challenge the scope of MTDB's take or assert a cross-complaint for inverse condemnation by withdrawing, in February 2003, the $79,357 deposited by MTDB as probable compensation for the directly condemned property. MTDB bases this contention on section 1255.260, which provides that the withdrawal of any portion of the probable compensation deposit "shall constitute a waiver by operation of law of all claims and defenses in favor of the persons receiving such payment except a claim for greater compensation." MTDB argues this provision barred RV as a matter of law from challenging the scope of MTDB's take, and the only claim RV could pursue after withdrawal of the deposit was one for "greater compensation" for such things as the property's fair market value, severance damages, and loss of goodwill. RVs response essentially is that under section 1255.260, withdrawal of the probable compensation deposit only waives challenges to the public entity's right to take and claims of lack of a public purpose.
We conclude the waiver provision of section 1255.260 does not bar RVs cross-action because RVs inverse condemnation claim is fundamentally a claim for greater compensation. MTDB asserts that "[g]reater compensation does not include a request that MTDB be ordered to expand its take, change the nature of a designated take, or be ordered to take extra property." However, as noted above, the court's adjudication of RVs inverse condemnation cross-complaint was not improper judicial interference with MTDB's direct condemnation decisions, but rather a determination of what additional property MTDB inversely condemned and what "greater compensation" it should pay RV for that taking. Under section 1255.260, "a condemnee's withdrawal of deposited funds waives any challenge to the right to take [citation], and any claim as to lack of a public purpose [citation]." (Clayton v. Superior Court (1998) 67 Cal.App.4th 28, 33, 78 Cal.Rptr.2d 750.) The statute "operates to relinquish claims and defenses otherwise available to contest allegations in a condemnor's complaint. It is a statutory waiver provision which serves to reduce the right-to-condemn issues to be litigated between the parties...." (Ibid., italics added.) RVs withdrawal of deposited funds in February 2003 was not a waiver of the right to seek greater compensation through an inverse condemnation cross-complaint.

III

EVIDENTIARY ISSUES
MTDB contends that a number of the court's evidentiary rulings constituted reversible error. "`[A]n appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' [Citation.]" (Dart Industries, Inc. v. Commercial Union Ins. Co. (2002) 28 Cal.4th 1059, 1078, 124 Cal. Rptr.2d 142, 52 P.3d 79.) A judgment will not be reversed for erroneous admission of evidence unless the reviewing court concludes it is reasonably probable that a *725 result more favorable to the appealing party would have been reached in the absence of the error. (Evid.Code, § 353, subd. (b); Huffman v. Interstate Brands Companies (2004) 121 Cal.App.4th 679, 692, 17 Cal. Rptr.3d 397; O'Hearn v. Hillcrest Gym and Fitness Center, Inc. (2004) 115 Cal. App.4th 491, 500, 9 Cal.Rptr.3d 342.)

A. RVs Evidence of Severance Damages
MTDB contends the court committed reversible error by admitting RVs evidence regarding severance damages despite RVs failure to properly exchange severance damage opinions under section 1258.250. Under section 1258.250, subdivision (b), a party must exchange a statement of valuation data for any witness the party intends to call to give opinion testimony regarding "[t]he amount of the damage, if any, to the remainder of the larger parcel from which [condemned] property is taken." Here, the parties exchanged valuation data in December 2002. The statement prepared by RVs appraiser Robert M. Lea did not disclose the amount of severance damages claimed by RV, but rather stated that "Damage to the Remainder" was "[t]o be determined."
At trial, MTDB filed a motion in limine to exclude evidence of severance damages not exchanged by RV. MTDB argued that RVs expert testimony regarding severance damages should be excluded under section 1258.280, subdivision (c), which provides: "No witness called by a party required to serve statements of valuation data on the objecting party may testify on direct examination during the case in chief of the party who called him to any opinion or data required to be listed in the statement of valuation data for such witness unless such opinion or data is listed in the statement served except that testimony that is merely an explanation or elaboration of data so listed is not inadmissible under this subdivision." MTDB acknowledged that under section 1258.290, the court may permit a witness to testify to an opinion that was not properly exchanged if the court finds the party has made a good faith effort to comply with the exchange requirements and the objecting party will not be prejudiced.[9] MTDB argued, however, that RV had not made a good faith effort to comply with the exchange requirements as to severance damages and that MTDB would be prejudiced by the admission of evidence of severance damages that was not disclosed in RVs statement of valuation.
In opposition to the in limine motion, RV argued Lea's severance damage testimony was admissible under section 1258.280, subdivision (c), as testimony that was "merely an explanation or elaboration of *726 data" listed on the earlier statement of valuation data. RV also argued the motion should be denied under section 1258.290 because RV was diligent in providing MTDB with Lea's updated appraisal report addressing severance damages by February 5, 2003, the date scheduled for Lea's deposition, and MTDB was not prejudiced because it had the opportunity to fully depose Lea regarding his valuation conclusions. The court denied MTDB's motion in limine, but did not articulate the basis for its ruling. In his deposition and at trial, Lea testified to over $2.1 million in severance damages. At trial, MTDB presented evidence of severance damages of $163,000. The jury awarded severance damages of $470,000.
"As to matters on which the record is silent, all intendments and presumptions are indulged on appeal in favor of the correctness of the trial court's actions. [Citation.]" (Cote v. Henderson (1990) 218 Cal.App.3d 796, 801, 267 Cal. Rptr. 274.) Accordingly, we presume the court denied MTDB's motion in limine to exclude RVs evidence regarding severance damages under section 1258.290 because it found RV made a good faith effort to comply with the exchange requirements with respect to severance damages and MTDB was not prejudiced by allowing RV to present its evidence on the issue.
We find no abuse of discretion in the court's allowance of RVs severance damage evidence. Section 1258.290 gives the court discretion to allow a witness to testify to an opinion or data that was required to be but was not included in a statement of valuation data "upon such terms as may be just" if the court finds the failure to list such opinion or data was due to "mistake, inadvertence, surprise or excusable neglect." Although subdivision (b) of section 1258.290 requires the court to take any prejudice to the objecting party into account, the Law Revision Commission Comment to section 1258.290 states that "[t]he consideration listed in subdivision (b) is important but is not necessarily the only consideration to be taken into account in making determinations under this section." (Cal. Law Revision Com. com., 19 West's Ann.Code Civ. Proc. (2007 ed.) foll. § 1258.290, p. 615, italics added.) Implicit in this comment is the principle that any prejudice to the objecting party must be measured against the constitutional requirement of just compensation for condemned propertythe foremost consideration in eminent domain proceedings.
Here, MTDB was provided with written notice of Lea's severance damage opinion and a full opportunity to depose Lea on the issue over five weeks before the valuation phase of trial commenced. Lea testified at his deposition that his figure for severance damages was inadvertently lumped together with damages for value of property taken in his original statement of valuation. In RVs opposition to MTDB's motion in limine to exclude severance damage evidence, RV argued that MTDB had asked the court to continue the original trial date from August 23, 2002 to April 2003 because MTDB needed more time to assess RVs severance damages, and that MTDB had taken the position that severance damages would be "unquantifiable" until construction was completed or at least 2003. During oral argument on the court's tentative rulings on in limine motions, MTDB's counsel stated, regarding the denial of MTDB's motion to exclude RVs evidence of severance damages (Motion In Limine No. 3 of 9): "On 3 I have nothing to say." Given these circumstances, the court could reasonably conclude that RV had substantially complied with the requirements of section 1258.290 for allowance of testimony regarding inadvertently omitted valuation *727 data,[10] and that RV would not be unduly prejudiced by the admission of such evidence. The court did not abuse its discretion in allowing Lea's severance damage testimony.

B. Specific Use Evidence
MTDB contends the court committed reversible error by admitting evidence of a specific plan of development and damages expressly tied to the specific plan.
Just compensation for property taken by eminent domain "is valued based on the highest and best use for which it is geographically and economically adaptable. [Citation.] A determination of the property's highest and best use is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner `is entitled to show a reasonable probability of a zoning [or other change] in the near future and thus to establish such use as the highest and best use of the property. [Citations.]' [Citations.] The property owner has the burden of showing a reasonable probability of a change in the restrictions on the property. [Citation.]" (County of San Diego v. Rancho Vista Del Mar, Inc. (1993) 16 Cal.App.4th 1046, 1058, 20 Cal.Rptr.2d 675.)
As a general rule, "a property owner may not value his property based upon its use for a projected special purpose or for a hypothetical business. [Citations.]" (County of San Diego v. Rancho Vista Del Mar, Inc., supra, 16 Cal.App.4th at p. 1059, 20 Cal.Rptr.2d 675.) However, "[w]hile a property owner may not generally present evidence of the value of his property `"in terms of money"' that the property would bring for a special purpose [citation], evidence of a particular use may be relevant to establishing the highest and best use since such evidence may tend to establish the property's adaptability for that kind of use [citations]." (Id. at pp. 1059-1060, 20 Cal.Rptr.2d 675.)
Thus, if construction plans are "introduced to show a specific land use they are inadmissible because fair market value is based on all reasonable available uses. [Citation.] Conversely, they are admissible when offered merely as an illustration of one of the uses to which the property is adapted and the evidence is expressly limited by the court to such object. [Citations.]" (People ex rel. Dept. of Transportation v. Tanczos (1996) 42 Cal. App.4th 1215,1218-1219, 50 Cal.Rptr.2d 70 (Tanczos).) Generally, evidence that condemned property is suitable for a particular purpose may properly be admitted when the highest and best use of the property is disputed or there is a dispute as to the feasibility of a particular use. (Emeryville Redevelopment Agency v. Harcros Pigments, Inc. (2002) 101 Cal.App.4th 1083, 1104-1105, 125 Cal.Rptr.2d 12; Tanczos, supra, 42 Cal.App.4th 1215, 1219, 50 Cal.Rptr.2d 70.)
The evidence in question here included conceptual drawings showing a multiple residential development that could be built on the property and testimony by several *728 of RV's expert witnesses concerning such use of the property. MTDB filed a motion in limine to exclude evidence of a specific development plan. The court denied the motion without prejudice to object to specific evidence as it was introduced.
During the testimony of RV's civil engineering expert Armstrong, whose specialty was analyzing the physical feasibility of building contemplated projects on particular pieces of land, RV sought to show the jury conceptual drawings (exhibit 540) of a multiple-family residential development on the subject property and have Armstrong testify about the feasibility of building such a project. RV's counsel asked Armstrong: "How would you describe [the drawings] in terms of their detail? Are they a specific plan or are they conceptual?" Armstrong answered, "They're a conceptual level of plans."
MTDB's counsel objected to the drawings on-the ground they showed a specific plan of development, arguing such "feasibility studies" were inadmissible because the highest and best use of the property was not at issue.[11] RVs counsel disagreed, arguing there was a dispute over the property's highest and best use and that the drawings were not a specific plan but rather "vague conceptual drawings."
The court allowed the jury to see the drawings but did not admit them into evidence. The court admonished the jury as follows: "Okay, we have kind of a slightly evidentiary issue. [Exhibit] 540 is going to be a drawing that the law is pretty clear that in these types of cases, you can't make any decisions based on a particular plan, a specific plan, because what happened was people ... would be in this situation, and they would hire somebody to go up and design the Empire State Building and then bring it in here and say, okay, you know, this is a $150 million project that we had going. And the courts have said that's pretty speculative between a drawing on some ground that ... doesn't have anything on it versus the Empire State Building. [¶] But ... I'm going to allow you to see a conceptual, generic type project ... that is the result of Mr. Armstrong's thoughts generally about the type of project that can be on [the property], but I'm not going to admit it into evidence because I'm afraid ... you'll take it back and start relying on it as a real thing, when it's actuallyit came up after this lawsuit was initiated, so I'm going to allow you to see it as a demonstrative concept of the type of projects Mr. Armstrong is talking about, okay? But that's really about all the use you're going to be able to legally get out of it, but I think it's fair for you to see it."
After Armstrong testified about exhibit 540, RV introduced exhibit 539, showing how residential units would have to be constructed with the trolley line in place. On MTDB's objection, the court excluded exhibit 539. MTDB does not address Armstrong's testimony in this appeal.
After RVs economist, Alan Nevin, testified that the highest and best use of the property would be "condominiums," RV introduced exhibit 752, which is not part of the record on appeal but apparently set forth comparisons of the construction costs and market demand for different types of projects that could be built on the property *729 to show that the most profitable use was residential. MTDB's counsel objected that the exhibit and Nevin's related testimony were inadmissible as "developer's approach"[12] and specific plan evidence, renewing his argument that there was no dispute as to the property's highest and best use.
The court allowed Nevin to use exhibit 752 to explain his market analysis, but decided the specific numbers on the exhibit would be left out. The court again admonished the jury: "So you know a little bit what's going on, the law doesn't [allow] somebody ... to tell the jury you have a specific plan and this is what the plan would cost and we're going to build the Empire State Building on it, but there has to be a basis for determining what is the best use, the most profitable use. And so we're talking over now how specific we can get, because a plan is simply that, [¶] And so the law says that is inadmissible because plans don't always work out the way you see it, so Mr. Nevin is going to talk about generally the process without utilization of specific numbers because the courtthe law finds that they're too speculative to be using numbers for any particular project...." The court added: "[Exhibit] 752 has some work-up, some numbers, and I think that's inappropriate and so [RVs counsel] has told me she never intended to use the numbers themselves, but generally just to inquire from the witness the process of determining highest feasibility and how that works, so we'll keep it on a hypothetical basis, if we could please, Mr. Nevin."
On appeal, MTDB objects to Nevin's testimony that (1) the specific density of the property was 30 condominium units per acre; (2) the property could be used for affordable housing; (3) because of the trolley line and its 30-foot retaining wall, a condominium project built on the property would have to be an "interior looking project" and, as a result, units would sell for 10 to 20 percent less than they would if there were no trolley and they could be built to face open space that the trolley wall would block; and (4) that all of the units in a development called "Park Lofts" that "face openness" had sold, but none of the units that do not face openness had sold.
MTDB also objects on appeal to testimony by RVs appraiser, Lea, that (1) the highest and best use of the property was multiple residential use rather than commercial; (2) the hillside at the rear of the property is not usable for commercial use without grading and constructing a retaining wall, but a developer could put residential units with a view on the hillside; (3) in the C zone, a development must have some commercial use; (4) his valuation of the property was based on a density of 30 units per acre;(5) all of the comparison sales he used to value the subject property were of properties intended only for multiple residential use; (6) his value opinion was based on a price per unit of $60,000 and a price per square foot of $41; (7) he subtracted $1 million from the value of the property's value as the cost of making the site ready for multiple residential development; (8) he had never used a zones of value approach to appraising land and considered *730 it to be a discredited approach; (9) the price RV paid for the property in 1998 was not useful to his analysis because of the distance in time from the date of valuation and the change in the nature of the property, and he gave it no weight; (10) the trolley project would reduce the overall value of the remaining property just under $1 million due to retaining walls, noise, vandalism, dust, headlight glare, fuels, vibration, and a resulting loss of value to some of the potential units; and (11) all of his comparison sales except one were properties that were ready for development.[13]
We find no abuse of discretion in the court's admission of RVs evidence that the highest and best use of the subject property was a multiple residential development. Notwithstanding MTDB's position that the highest and best use of the property was not at issue, the court was faced with a genuine dispute as to whether the highest and best use was commercial or multiple residential. The property's commercial manufacturing or "CM" zoning allowed commercial development only, but RVs highest and best use claim was based on a mixed commercial and residential development that would be allowed if the zoning were changed to "C." Lea's testimony provided substantial evidence that a zoning change from CM to C was reasonably probable because, among other reasons, the change could be effected without having to amend the city's general plan.
Because the highest and best use of the property was disputed, the court did not abuse its discretion in allowing RV to show the jury conceptual plans for the type of multiple residential development it claimed to be the property's highest and best use. (County of San Diego v. Rancho Vista Del Mar, Inc., supra, 16 Cal.App.4th at pp. 1059-1060, 20 Cal.Rptr.2d 675.) As noted, such conceptual plans "are admissible when offered merely as an illustration of one of the uses to which the property is adapted and the evidence is expressly limited by the court to such object. [Citations.]" (Tanczos, supra, 42 Cal.App.4th 1215, 1218-1219, 50 Cal.Rptr.2d 70.) Here, the court twice admonished the jury that it was not allowed to consider a specific plan of development and must view the conceptual plans for a multiple residential development on the property only as a "demonstrative concept" or, in Nevin's case, as an illustration of his "process of determining highest feasibility and how that works...." Lea testified that 30 units per acre could be built on the property, but he was not saying this was a specific plan for the property, as the number could be lower or higher. As noted, Armstrong also testified that the exhibit 540 drawings were not a specific plan but rather "a conceptual level of plans."
In People ex rel. Dept. of Pub. Wks. v. Silveira (1965) 236 Cal.App.2d 604, 627, 46 Cal.Rptr. 260, the appellate court approved the trial court's allowance of "economic approach" evidence for the limited purpose of determining the subject property's highest and best use, but also approved the trial court's exclusion of evidence of a specific dollar value of the property derived from that evidence. Like the trial court in Silveira, the trial court here acted within its discretion in allowing the jury to consider exhibit 752 and Nevin's testimony about the exhibit's comparison of development costs and market demand for different types of projects to show that the *731 highest and best use of the property use was residential, but not allowing the jury to consider the specific numbers on exhibit 752 in determining the value of the property.
MTDB asserts that severance damages for loss of view from hypothetical multiple residential units are contrary to law. MTDB cites to testimony by Lea regarding loss of value or "price discounting" of the remaining property as a result of having to build certain units on the property to face away from the trolley retaining wall on the south boundary of the property, instead of building them to face what would be a view of open hillside to the south but for the retaining wall. MTDB argues there is no legal right to a view in California and RVs "loss of view" damages are "based solely upon a specific plan of development and speculation."
As discussed above, the court did not admit improper evidence of a specific plan of development, as RVs evidence regarding a potential multiple residential or condominium development was admissible to show that such a development was the property's highest and best use. Having properly introduced that evidence of highest and best use, RV was entitled to show how the trolley project would impact the value of its remaining property for that use. RVs evidence of the reduction of the remaining property's value as a result of having to build inward-facing units did not contravene the rule that there is no right to a view under California law; it was admissible evidence of the effect of the trolley project on the market value of RV's remaining property in light of its highest and best use as a multiple residential development.
In any event, the jury's verdict indicates it did not fully embrace Lea's valuation opinions. Lea concluded the value of the property taken by MTDB was $2,777,000 and RV's severance damages were $2,150,000. The jury found substantially lower amounts in both categories, awarding $1,927,604 for the value of the property taken and $470,000 in severance damages. Thus, to the extent the court erred in admitting RVs evidence regarding use of the property for a multiple residential development, MTDB has not shown it was prejudiced by the error. The court's admission of evidence concerning the potential use of the property as a multiple residential development is not a basis to disturb the judgment.

C. Value Engineering Evidence
MTDB contends the court committed reversible error by admitting evidence of MTDB's value engineering decisions during the planning phase of the project. By "value engineering" MTDB means cost-saving changes in the original plans for the trolley line through RVs property. MTDB argues the value engineering evidence should have been excluded under Evidence Code section 813, subdivision (b), which provides that "evidence of the character of the improvement proposed to be constructed by the plaintiff in an eminent domain proceeding" is not subject to impeachment and rebuttal.[14]
*732 MTDB sought to exclude value engineering evidence through a motion in limine "to exclude evidence, testimony or opinions about the project other than as planned." In opposition to the motion, RV argued that evidence of value engineering decisions and project design changes was relevant because MTDB intended to introduce evidence of the price RV paid for the property in 1998. RV reasoned that evidence of the purchase price would be prejudicial to RV unless it was able to introduce evidence of the condition of the property at the time of purchase, including the state of the trolley project, which was then in the design stage. Contending the 1998 design was more aesthetically pleasing and functional than the ultimate design, RV argued that the information it had about the design in 1998 was significant to its decision to buy the property. RV also argued that evidence the project design was in a "state of constant flux" was relevant to the issue of why RV had not developed the property to its highest and best use at the time of trial. RV argued that if the court allowed MTDB to introduce evidence of the 1998 purchase price and RVs failure to develop the property to its highest and best use, RV should be allowed to counter with evidence of the 1998 design plans for the project and the effect of later design changes on RVs development schedule for the property.
The court decided it would grant MTDB's motion to exclude evidence and opinions of the project other than as planned if MTDB intended not to present evidence of the price RV paid for the property. However, if MTDB intended to present evidence of RVs purchase price, the court would deny the motion and admit evidence of the design plans relied on by RV when it purchased the property. MTDB's counsel responded: "Although, I don't think that the two are intertwined, my preference would be to put on the value of the property [at the time of RV purchased it]. If that requires that we hear about value engineering, so be it."
The court did not abuse its discretion in admitting RVs value engineering evidence. MTDB does not cite, and we are unable to find, any case authority specifically addressing the admissibility of such evidence, let alone supporting its exclusion. Evidence Code section 813 does not prohibit admission of evidence of project changes, it merely provides that evidence of the character of the project is not subject to impeachment or rebuttal. MTDB does not explain how the project change or value engineering evidence in question impeached or rebutted any evidence of the ultimate design or character of the trolley project. Because MTDB was unwilling to forgo introducing evidence of the price RV paid for the property, the court reasonably allowed RV to introduce value engineering evidence for the purposes RV articulated in its opposition to MTDB's in limine motion.
In any event, MTDB does not convincingly argue that admission of the value engineering evidence prejudicially affected the jury's verdict. MTDB contends it affected the severance damage award, but provides no solid basis for that contention. The effect of the ultimately constructed project on RVs remaining property is what it is, regardless of whether a rejected design would have resulted in lower severance damages. It is pure speculation to surmise that the jury somehow translated, the costs savings MTDB realized by redesigning the trolley line through the condemned property to severance damages to *733 RV's remaining property, or that the severance damages the jury awarded were based on the view that MTDB unreasonably rejected a less damaging design. Because the evidence of MTDB's design changes is irrelevant to the value of the property taken and the effect of the ultimately constructed project on the value of RVs remaining property, there is no basis beyond mere speculation to conclude its admission prejudicially affected the jury's verdict.

D. Lea's Rejection of Zones of Value Approach
MTDB contends the admission of Lea's entire valuation opinion testimony was reversible error because Lea failed to use or consider the zones of value methodology in reaching his opinion. MTDB filed a motion in limine "to exclude opinions of value not utilizing zones of value methodology." The court denied the motion and explained its reluctance in eminent domain cases to entirely exclude the testimony of a party's valuation expert on the ground the expert's valuation determination is contrary to law. Essentially, the court concluded Lea's rejection of a zones of value approach went to the weight of his valuation opinion rather than its admissibility.[15]
"A trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is to be based. [Citations.]" (Korsak v. Atlas Hotels, Inc. (1992) 2 Cal.App.4th 1516, 1523, 3 Cal. Rptr.2d 833.) "It is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion. [Citation.]" (Ibid.) "The abuse of discretion standard ... measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." (Department of Parks & Recreation v. State Personnel Bd. (1991) 233 Cal.App.3d 813, 831, 284 Cal.Rptr. 839.)
We conclude the court did not abuse its discretion in allowing Lea to testify. Lea laid a proper foundation for his methodology of valuing the property as a whole for multiple residential use by taking into consideration the physical characteristics of dissimilar parts of the property but not assigning different values to the different parts. When asked if different parts of the property should be priced differently, he responded: "Well, each market is somewhat different. For multiple residential use, ... the value [of the property] would not be cut up and allocated to different pieces of the property. It would be looked at as whole, accommodating multiple residential use." When later asked whether the creek and hillside portions of the property should be valued higher than the rest of the property as "positive amenity features," Lea stated: "There's no developer that I know of has or would venture an estimate as how to do that and they use the overall [pro] rata value."
MTDB has cited no case authority that clearly mandates use of a zones of value approach in this case. MTDB cites Los Angeles County Flood Control Dist. v. McNulty (1963) 59 Cal.2d 333, 29 Cal.Rptr. 13, 379 P.2d 493 (McNulty) and other cases for the proposition that "it is not proper to attribute a per-square-foot value to [a condemnee's] entire property and then apply the value to the parcel condemned unless each square foot of [the *734 condemnee's] land has the same value and that, if the parcel condemned is different in quality from the rest of the land, it should be assigned a different value." (Id. at p. 336, 29 Cal.Rptr. 13, 379 P.2d 493.) McNulty concluded a jury instruction to that effect was proper where the plaintiff had condemned a 2.62 acre portion of the defendants' property to construct a flood control channel and there was expert testimony that 2.55 acres of the condemned portion would have to be used as a drainage ditch to develop the property to its highest and best use. (Id. at pp. 335-336, 29 Cal.Rptr. 13, 379 P.2d 493.)
McNulty cited three cases in support of its conclusion that "the instruction correctly states the applicable principles of law." (McNulty, supra, 59 Cal.2d at p. 337, 29 Cal.Rptr. 13, 379 P.2d 493.) The first was People ex rel. Dept. of Public Works v. Neider (1961) 195 Cal.App.2d 582, 16 Cal. Rptr. 58, in which the Court of Appeal upheld the trial court's refusal to instruct the jury that if it found the portions of the condemnee's property taken by the state were worth more "`considered as strips of commercially zoned land along the highway than they would be considered merely as average parts of the entire area ... then it would be your duty to value them at their higher or greater value.'" (Id. at p. 590, fn. 5, 16 Cal.Rptr. 58.) The Court of Appeal decided the condemnee's rejected instructions invaded "the fact-finding province of the jury [and] it was up to the jury to evaluate the testimony of the experts, and to accept or reject their theories depending on whether the jury found them to be correct." (Id. at p. 590, 16 Cal.Rptr. 58.) The Court of Appeal concluded the trial court had correctly instructed the jury that it "was not bound to value on a square foot basis, and that [it] need not assume that the frontage portion of the land is of exactly the average value per square foot of the whole parcel. [The trial court correctly] advised the jury that with respect to both the front foot method and the per square foot method, it must consider the testimony of all the witnesses and the method employed by them, either front foot or square foot, and [be] the `sole judges of that testimony and of that portion thereof which you wish to accept.'" (Ibid.)
McNulty, supra, 59 Cal.2d 333, 29 Cal. Rptr. 13, 379 P.2d 493 also cited Hayward Union High School Dist. v. Lemos (1960) 187 Cal.App.2d 348, 353, 9 Cal. Rptr. 750, in which the Court of Appeal decided the trial court properly refused to strike the testimony of an appraiser who valued condemned property by adding together different values for the rear and front portions of the property. The Court of Appeal stated: "Taking [the appraiser's] testimony as a whole, it is clear that he was giving his opinion as to the fair market value of the property as a whole. There is no reason why an appraiser, in determining the value of a piece of property, may not in arriving at its market value as a whole determine that certain portions of it are worth less than other portions. Frequently an appraiser will place a front foot value on the front of it and a square foot value on the less valuable rear portions as against other portions. There was no violation of the general rule that `the market value is to be determined by considering the property as a whole ...' [Citation.]" (Ibid.)
Finally, McNulty, supra, 59 Cal.2d 333, 29 Cal.Rptr. 13, 379 P.2d 493 cited People v. Loop (1954) 127 Cal.App.2d 786, 796-800, 274 P.2d 885, in which the Court of Appeal discussed when it is appropriate, in a partial taking eminent domain case, to value condemned property by assigning a single value to every square foot of the entire property, as opposed to assigning different values to the part taken and the *735 remaining property. The Court of Appeal stated: "Whether the opinion of a witness that each and every square foot of a parcel of property does not have the same value as each and every other square foot is sound, does not present a question of law[, but rather] a question of fact for the jury. [Citation.] The weight to be given to the opinion of a witness is a question of fact for the jury. The jury are the exclusive judges of the credibility of witnesses [citation]; the rule applies to expert witnesses. [Citations.] [The jury] are the judges of the effect or value of opinion evidence. [Citations.]" (Id. at pp. 799-800, 274 P.2d 885.)
These cases support the principle that although under certain circumstances it may be appropriate to assign different values to different portions of the subject property in an eminent domain case, whether a zones of value methodology is appropriately applied in a particular case is ordinarily a question of fact for the jury to decide. There is no general rule under California case law mandating use of a zones of value methodology in every eminent domain case in which different portions of the subject property would have different per-square-foot values as free standing parcels. We agree with the trial court that Lea's rejection of the zones of value methodology urged by MTDB went to the weight rather than the admissibility of his valuation testimony.
Moreover, the specific zones of value methodology used by Brabant has been disapproved by California case law. In San Bernardino County Flood Control Dist. v. Sweet (1967) 255 Cal.App.2d 889, 900, 63 Cal.Rptr. 640 (Sweet), the appellate court noted that "the adaptability of part of a single parcel to a highest and best use differing from that to which other portions may be adaptable by reason of its distinctive character may be considered by a valuation witness on the theory that it is a factor which a knowing buyer would consider in determining the price he would pay for the whole. [Citation.]" However, Sweet observed, it is not proper to "separately [appraise] in terms of money different parts of a single undivided parcel and [take] the total as the fair market value of the whole. [Citations.]" (Ibid.) Sweet noted that although the eminent domain plaintiff in that case waived the issue by failing to object at trial, the defendant's valuation expert had improperly "valued in terms of money each separate area [of the condemned property] and treated the total as the market value of the whole." (Id. at p. 901, 63 Cal.Rptr. 640, fn. omitted.)[16]
In San Diego County Water Authority v. Mireiter (1993) 18 Cal.App.4th 1808, 1818, 23 Cal.Rptr.2d 455 (Mireiter), this court stated that Sweet, supra, 255 Cal. App.2d 889, 63 Cal.Rptr. 640 "stands for the relatively unremarkable proposition that where different parts of a single parcel are adaptable to different uses, they may contribute differently to the total value of the parcel. Nonetheless, it is the entire parcel which must be valued. Thus, it is generally inappropriate to treat the single parcel as merely the aggregate of a number of separate pieces because each has an impact on the others which may either increase or decrease the value. Sweet appropriately concludes that the interrelationship among the pieces must be considered in any appraisal of the entire parcel." (Italics added.) Accordingly, Mireiter held "that to the extent any appraiser *736 utilizes a `zone of value' approach, the interrelationship among the zones must be considered in determining a single value for the single piece of condemned property." (Mireiter, supra, at p. 1818, 23 Cal. Rptr.2d 455, fn. omitted.)
The zones of value methodology used by MTDB's valuation expert Brabant at trial was essentially the approach that Sweet, supra, 255 Cal.App.2d 889, 63 Cal. Rptr. 640 and Mireiter, supra, 18 Cal. App.4th 1808, 23 Cal.Rptr.2d 455 disapproved. Without objection, Brabant valued the "level usable land" at $17.84 per square foot, the "sloping usable land" at $9.74 per square foot, and the "creek area" at $.80 per square foot. He then multiplied the value per square foot for each area times the number of square feet in that area, and added those totals together to calculate the value of the entire property. Brabant similarly valued the property taken by separating it into different zones of value (i.e., level usable land, sloping usable land, creek area, and drainage easement), multiplying the per-square-foot value for each particular zone times the square footage of the zone, and adding the totals for each zone together. In short he inappropriately treated "the single parcel as merely the aggregate of a number of separate pieces" without considering "the interrelationship among the pieces...." (Mireiter, supra, 18 Cal.App.4th at p. 1818, 23 Cal.Rptr.2d 455.)[17]
Lea's testimony, on the other hand, reflects that he considered the interrelationship among the different parts of the property and factored in the physical characteristics of each area in determining a single amount per square foot for the entire property. Lea testified that although the creek area was a detriment to commercial use, for residential use developers would view the creek and hillside as "positive amenity features." On cross-examination Lea explained that in determining the value amount per square foot that he applied to the entire property, he determined the pro rata contribution of the different areas to the whole. For example, he lowered the pro rata value of the property to reflect the cost of having to relocate the sewer and valued the creek area, as an amenity, at 90 percent of fee value. Brabant's methodology was more suspect under Mireiter and Sweet than Lea's.
MTDB has not shown that as a matter of law, Brabant's zones of value methodology was the only methodology the jury could consider in making its valuation determinations. Because Lea laid an adequate foundation for his valuation opinions and his opinion testimony fell within the "permissible range of options set by the legal criteria," (Department of Parks & Recreation v. State Personnel Bol., supra, 233 Cal.App.3d at p. 831, 284 Cal.Rptr. 839), the court did not abuse discretion in admitting the testimony and allowing the jury to determine the weight it should be accorded.

IV

REJECTION OF ZONES OF VALUE INSTRUCTIONS
MTDB contends the court should have given the following two special jury instructions it requested: (1) "It is not proper to attribute the same per-square foot *737 value to the entire property unless each square foot has the same value." (2) "Not all parts of the property may be of the same worth. The part taken may be of distinctly different quality from the part not taken and the fair market value of the part taken may also be worth more or less than the part not taken. You are to value the part not taken accordingly."
"Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (Fibreboard Paper Products Corp. v. East Bay Union of Machinists (1964) 227 Cal. App.2d 675, 718, 39 Cal.Rptr. 64.) "Error cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. [Citations.]" (Id. at p. 719, 39 Cal.Rptr. 64; Hyatt v. Sierra Boat Co. (1978) 79 Cal.App.3d 325, 335,145 Cal.Rptr. 47.)
MTDB's proffered zones of value instructions amount to improper argument to the jury in the guise of a statement of law, as they unduly emphasize MTDB's zones of value theory of valuation. Had the court given them, it would have effectively instructed the jury to accept MTDB's valuation methodology and reject RVs methodology.
Moreover, the subject of valuation was substantially and adequately covered by the instructions given. The jury was instructed to determine the fair market value of the property solely from the opinions of the witnesses who testified, and that evidence of the witnesses'"reasons for their opinions of value, and all other evidence concerning the subject property including your view of it, is to be considered only for the limited purpose of enabling you to understand and weigh the opinions of the witnesses regarding market value and severance damages and benefits, if any." (BAJI No. 11.80.) The jury was further instructed to "[r]esolve any conflict in the testimony of witnesses by weighing each opinion against the others, the reasons given for each opinion, the facts relied upon and the credibility and qualifications of each witness." (Ibid.) The court also gave BAJI Nos. 11.81 and 11.82, which provide detailed explanations of the matters relied on by valuation witnesses and how the jury should consider those matters in weighing the witnesses' valuation opinions. The instructions given provided the jury sufficient guidance to make its valuation findings and enabled them to accept MTDB's zones of value analysis if it found it credible. The court did not err in refusing MTDB's zones of value instructions.

DISPOSITION
The judgment is affirmed. Costs are awarded to Respondent.
WE CONCUR: McDONALD and McINTYRE, JJ.
NOTES
[1] All further statutory references are to the Code of Civil Procedure unless otherwise noted.
[2] The League of California Cities and California State Association of Counties filed an amicus curiae brief in support of MTDB, arguing that the trial court should not have allowed RVs inverse condemnation cross-action to proceed and that the proper date of valuation was the date MTDB deposited probable compensation rather than the date of trial.
[3] Article I, section 19, of the California Constitution sets forth the constitutional requirement of just compensation for private property taken by the government for public use, stating: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."
[4] Deciding an issue that is not pertinent to this appeal, Mt. San Jacinto also held that "imposition of a waiver [under section 2155.260] of the right to challenge the validity of the taking if the owner elects to withdraw the deposit does not undermine the constitutionality of the statutory scheme nor the legislature's chosen method of valuation." (Mt. San Jacinto, supra, 40 Cal.4th at p. 666, 54 Cal.Rptr.3d 752, 151 P.3d 1166.)
[5] The present case is similarly distinguishable from Redevelopment Agency of the City of San Diego v. Mesdaq (2007) 154 Cal.App.4th 1111, 65 Cal.Rptr.3d 372 (Mesdaq), an eminent domain case in which this court decided that the date the condemnor deposited probable compensation was the proper date of valuation under Mt. San Jacinto and sections 1255.010 and 1263.110. (Mesdaq, supra, at pp. 1123-1126, 65 Cal.Rptr.3d 372.) Mesdaq fell "squarely within the holding of Mt. San Jacinto" because even though the property owner had not sought to increase the probable compensation deposit under section 1255.030, the trial court nevertheless considered and rejected his informal challenges to the adequacy of the deposit. (Mesdaq, supra, at p. 1125, 65 Cal.Rptr.3d 372.) Thus, like Mt. San Jacinto and unlike the present case, there was a judicial determination in Mesdaq that the deposit of probable compensation was sufficient.
[6] Section 1263.130 provides: "Subject to Section 1263.110, if the issue of compensation is not brought to trial within one year after commencement of the proceeding, the date of valuation is the date of the commencement of the trial unless the delay is caused by the defendant, in which case the date of valuation is the date of commencement of the proceeding."
[7] We recognize that in City of Santa Clarita v. NTS Technical Systems (2006) 137 Cal. App.4th 264, 270-273, 40 Cal.Rptr.3d 244, the Court of Appeal held that a condemnor's voluntary increase of its probable compensation deposit three years after its initial deposit did not change the date of valuation from the date of the initial deposit to the date of the additional deposit. However, Santa Clarita's decision on that issue was largely based on the fact that the property owner did not challenge the initial deposit by invoking the procedure under section 1255.030 to increase the deposit, as RV did in the present case.
[8] Richmond set forth the following discussion from People v. Buellton Development Co. (1943) 58 Cal.App.2d 178, 183-184, 136 P.2d 793 regarding the former eminent domain statutes: "[S]ection 1246 of the Code of Civil Procedure, still in effect at the time of this suit,' ... provides that each defendant must, by answer, set forth his estate or interest in the property sought to be condemned and the amount he claims as damages by reason of its taking;' section 1248 declares what items of damages are recoverable, so as to include the value of the land to be taken and the damages to the remainder of any larger parcel of which it is a part. Section 1247 empowers the court to pass on conflicting claims to the property to be condemned, and section 1246.1 entitles the plaintiff to have die whole award determined as between the plaintiff and all defendants claiming any interest in the property sought to be condemned[.]'" (Richmond, supra, 48 Cal.App.3d at p. 351, 122 Cal.Rptr. 434.)
[9] Section 1258.290 provides: "(a) The court may, upon such terms as may be just (including but not limited to continuing the trial for a reasonable period of time and awarding costs and litigation expenses), permit a party to call a witness, or permit a witness called by a party to testify to an opinion or data on direct examination, during the party's case in chief where such witness, opinion, or data is required to be, but is not, included in such party's list of expert witnesses or statements of valuation data if the court finds that such party has made a good faith effort to comply with Sections 1258.210 to 1258.260, inclusive, that he has complied with Section 1258.270, and that by the date of exchange he: [¶] (1) Would not in the exercise of reasonable diligence have determined to call such witness or discovered or listed such opinion or data; or [¶] (2) Failed to determine to call such witness or to discover or list such opinion or data through mistake, inadvertence, surprise, or excusable neglect. [¶] (b) In making a determination under this section, the court shall take into account the extent to which the opposing party has relied upon the list of expert witnesses and statements of valuation data and will be prejudiced if the witness is called or the testimony concerning such opinion or data is given."
[10] In its reply brief, MTDB contends that RV failed to comply with section 1258.270, subdivision (a) (as required by § 1258.290, subd. (a)), because it did not provide MTDB an amended exchange of valuation data. Section 1258.270, subdivision (a) required RV to "diligently give notice to the parties upon whom [its] list and statements were served" of the opinion and data that was required to be but was not listed in its prior exchange. Section 1258.270, subdivision (b) requires that such notice be in writing and "include the information specified in Sections 1258.240 and 1258.260." Lea's updated appraisal dated February 4, 2003 and received by MTDB around the time of Lea's deposition satisfies these requirements of section 1258.270.
[11] The property was zoned "CM" which allows for commercial use only. RV's highest and best use claim was based on a mixed commercial and residential development that would not be allowed under the property's CM zoning, but would be allowed if the zoning was changed to "C." MTDB's counsel argued: "As far as I'm concerned, commercial is commercial and you don't get to show feasibility studies unless the highest and best use is at issue. And if it's commercialC.M. or `C' it's not at issue."
[12] The "developer's approach," also referred to as the "economic," "economic analysis," or "residual land value" approach, is a valuation method whereby undeveloped lots are appraised by using estimated values of developed lots in the same subdivision and "deducting from the gross value of the `ultimate development' the pertinent expenses of development." (1 Matteoni & Veit, Condemnation Practice in California (Cont.Ed.Bar 3d ed. 2005) § 4.53, p. 163 (rev. 9/2007); see also Contra Costa Water Dist. v. Bar-C Properties (1992) 5 Cal.App.4th 652, 657-658, 7 Cal. Rptr.2d 91.)
[13] MTDB does not present separate argument on the admissibility of each item of Nevin's and Lea's testimony specified in this section of its opening brief. MTDB argues generally that the referenced testimony by Nevin and Lea is inadmissible as developer's approach evidence or evidence of a specific plan of development.
[14] Subdivision (a) of Evidence Code section 813 sets forth the categories of persons who may provide opinion evidence regarding the value of property. Subdivision (b) of Evidence Code section 813 provides, in its entirety: "Nothing in this section prohibits a view of the property being valued or the admission of any other admissible evidence (including but not limited to evidence as to the nature and condition of the property and, in an eminent domain proceeding, the character of the improvement proposed to be constructed by the plaintiff) for the limited purpose of enabling the court, jury, or referee to understand and weigh the testimony given under subdivision (a); and such evidence, except evidence of the character of the improvement proposed to be constructed by the plaintiff in an eminent domain proceeding, is subject to impeachment and rebuttal."
[15] The court advised counsel: "[T]he [expert] witnesses generally will be allowed to testify using their valuations. And if they have valuations that are not credible, the jury, in my experience, will disregard them."
[16] Sweet stated: "On proper objection such testimony should have been excluded. Although the apparent impropriety of the method employed should have been immediately perceived, plaintiff interposed no objection...." (Sweet, supra, 255 Cal.App.2d at p. 901, 63 Cal.Rptr. 640.)
[17] On cross-examination, Brabant acknowledged that rule 1.4 of the Uniform Standards of Professional Appraisal Practice provides that "`When appraising property, the appraiser is to analyze the effect on value of the assemblage of the various estates or parts of a property and refrain from valuing the whole solely by adding together the individual values of the various estates or component parts[.]'"