[No. B149573. Second Dist., Div. Three. Jan. 30, 2004.]

MICHAEL O'HEARN, Plaintiff and Respondent, v.
HILLCREST GYM AND FITNESS CENTER, INC., Defendant and
Appellant;
DIRECT MARKETING ENTERPRISES, INC., et al., Defendants and
Respondents.
AUDUBON INSURANCE GROUP, Intervener and Appellant.

## COUNSEL

Selman and Breitman, Craig R. Breitman, Craig R. Maki, Lynette Klawon and Rachel E. Hobbs for Defendant and Appellant and for Intervener and Appellant.

T. Lance Archer for Defendants and Respondents.

Thomas A. Turner, Jr.; and Thomas A. Grossman for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Hillcrest Gym and Fitness Center, Inc. (Hillcrest) and intervener and appellant Audubon Insurance Group (Audubon) (sometimes collectively referred to as Hillcrest) appeal a judgment

in favor of plaintiff and respondent Michael O'Hearn (O'Hearn) following a jury trial on O'Hearn's claim for commercial appropriation of his likeness. (Civ. Code, § 3344, subd. (a).)[1]

■ Hillcrest seeks, on its appeal from the judgment, appellate review of the trial court's earlier order approving a good faith settlement between O'Hearn and defendants and respondents Direct Marketing Enterprises, Inc. (Direct Marketing) and Redd Gardner (Gardner). This contention is not properly before us. A party wishing to challenge the merits of a good faith settlement determination must do so by way of a petition for writ of mandate as prescribed by statute. (Code Civ. Proc., § 877.6, subd. (e).)[2] Hillcrest did not seek writ review of the order approving the good faith settlement and the order is not reviewable at this juncture.

■ We also address whether the trial court prejudicially erred in admitting evidence of settlement agreements which O'Hearn obtained in other misappropriation cases for the purpose of establishing O'Hearn's damages in this case. We conclude those settlement agreements were irrelevant to O'Hearn's damages herein. Those settlement figures had no tendency to prove the amount of damages O'Hearn sustained as a consequence of the unauthorized use in this case. Further, on this record it is reasonably probable that a different result would have obtained absent the error. Therefore, the judgment on the general verdict is reversed and the matter is remanded for a new trial as to damages.

---

[1] Audubon is a party hereto because the trial court approved a stipulation allowing it to intervene in the action on behalf of Hillcrest, a suspended corporation, for purposes of defending the corporation, and with the recognition that the judgment as entered against Hillcrest would be binding on Audubon. The intervention by Audubon was proper, as was Hillcrest's continuing role in the litigation. Suspension of Hillcrest's corporate powers resulted in a lack of *capacity* to defend an action, which is merely a technical objection and waivable by O'Hearn. (*Color-Vue, Inc. v. Abrams* (1996) 44 Cal.App.4th 1599, 1604 [52 Cal.Rptr.2d 443].) Further, as explained in *Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383 [100 Cal.Rptr.2d 807], "[t]he state suspends a corporation that does not pay its taxes in order to pressure it to pay, not to penalize an innocent party, such as a corporation's insurer. [Citation.] . . . [¶] . . . [¶] Moreover, if [the insurer] does not intervene . . . and raise defenses to the [plaintiff's] claims, the [plaintiff] will be able to obtain an unopposed default judgment. The [plaintiff] will then be able to bring a direct action against [the insurer] for payment of the *default judgment to which [the insurer] is bound because it did not intervene. This result would* have the effect of punishing [the insurer] for something it did not do, since '[i]nsurers have no control over the solvency or corporate viability of their insureds.' [Citation.] It could also result in an unjustified windfall to the [plaintiff]." (*Id.* at p. 388.)

[2] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

O'Hearn is a bodybuilder who earns compensation by modeling, posing for fitness magazines, magazine ads, and romance novel covers, doing guest appearances and product endorsements, and the like.

Hillcrest is a gym in San Diego. In July 1997, it retained Direct Marketing to prepare and run an ad for the gym in a discount coupon book called the "Bonus Saver," which was distributed monthly as an insert to the San Diego Union Tribune.

In designing the ad for Hillcrest, Direct Marketing used two photographs of individuals in the proof of the layout, photographs it had clipped from a magazine. O'Hearn was one of the individuals depicted therein. Direct Marketing placed the photographs in the proof to show the intended placement of the figures in the final ad, but its plan was eventually to reduce the photographs to line art, avoiding the need for model releases.

Hillcrest reviewed the proof of the ad layout. Rather than creating line drawings, Direct Marketing finalized the ad with the original photographs. The ads ran nine times over a 10-month period in 1997–1998. O'Hearn discovered this unauthorized use in mid-1998.

2. *Proceedings.*

a. *Pleadings.*

On December 7, 1998, O'Hearn filed suit against Hillcrest and Dennis G. Podracky (Podracky), an owner of Hillcrest, alleging a statutory cause of action for commercial appropriation under Civil Code section 3344, subdivision (a), as well as common law invasion of privacy.[3] O'Hearn subsequently amended his complaint to add Direct Marketing and its manager, Gardner, as defendants.

On April 25, 2000, Hillcrest filed a cross-complaint against Direct Marketing for indemnity.

b. *O'Hearn's good faith settlement with Direct Marketing and Gardner.*

In May 2000, O'Hearn settled his claims against Direct Marketing and Gardner for $29,500.

---

[3] Podracky later was dismissed by stipulation. Also, O'Hearn eventually dismissed the common law claim and proceeded solely on the statutory cause of action.

Direct Marketing and Gardner moved for an order determining the good faith of the settlement. On July 7, 2000, the trial court entered an order approving the settlement as being in good faith.[4]

Hillcrest did not seek review of that determination by way of a petition for writ of mandate. (§ 877.6, subd. (e).)

c. *Trial.*

In January 2001, the matter came on for a jury trial on O'Hearn's cause of action against Hillcrest, the sole remaining defendant. As noted in footnote 1, *ante*, because Hillcrest was a suspended corporation, the trial court approved a stipulation by the parties allowing Audubon to intervene in the action for purposes of defending the matter.

One of the major issues at trial was O'Hearn's damages. Over Hillcrest's objection, the trial court allowed O'Hearn to introduce two settlement agreements he obtained in unrelated cases for purposes of establishing his damages from the instant unauthorized publication.

One of the settlement agreements arose out of an action filed by O'Hearn in federal court in Tennessee arising out of the unauthorized use of his image in certain advertisements for Universal Gym in Tennessee (the Tennessee settlement). The offending newspaper ad ran twice in two months. The settlement amount in that case was $75,000, or $37,500 per month for the two months that the ad ran.

In addition, O'Hearn testified that shortly before trial, he obtained a settlement in Florida for the unauthorized use of his image by Beyond Fitness, a vitamin store (the Florida settlement). Said matter similarly settled for $37,500 for one month's unauthorized use.

Based on these settlement amounts, O'Hearn opined that the value of the unauthorized use of his image in the instant case was $37,500 for each month the ad ran in the Bonus Saver.

In addition to these settlement amounts, O'Hearn testified to his earnings from cover shots, endorsements and the like. For cover shots, sometimes he received nothing, sometime $300 or $500. For guest appearances, he received between $2,000 and $4,000. For romance novels, he earned about $5,000, not

---

[4] The effect of an order determining that a settlement was made in good faith is to "bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (§ 877.6, subd. (c).)

on a per book basis. He also received perquisites, such as a year's clothing from the Ironman clothing line for him and his wife, and a suntan bed for endorsing Suntan Industries' product.

His most lucrative work was product endorsements. For example, he had an endorsement contract with Envision Marketing Group for endorsing nutritional supplements, for which he received $12,000 per month for seven months. Another endorsement contract, which ran between April 1997 and August 1998, paid him an average of $19,760 per month, based on $6,000 per month plus 2 percent of Bodyonics' limited gross sales.

The jury returned a general verdict, awarding O'Hearn $144,000 as compensation for the use of his photo. After deducting the $29,500 O'Hearn received in the good faith settlement with Direct Marketing and Gardner, the trial court entered judgment in favor of O'Hearn and against Hillcrest and Audubon for $114,500.

### d. *Further proceedings.*

Subsequently, the trial court awarded O'Hearn attorney fees and costs pursuant to Civil Code section 3344 in the sum of $105,221.15. A motion by Hillcrest for a new trial was denied.

Hillcrest and Audubon filed a timely notice of appeal from the judgment.[5]

## CONTENTIONS

Hillcrest contends: the determination of good faith settlement was not supported by substantial evidence; the trial court prejudicially erred in admitting evidence of O'Hearn's prior settlements in unrelated cases as evidence of his damages herein; and the trial court abused its discretion in denying a midtrial continuance.

## DISCUSSION

1. *Hillcrest's challenge to the sufficiency of the evidence to support the trial court's good faith settlement determination is not reviewable at this juncture.*[6]

---

[5] Although the notice of appeal also purports to appeal from the trial court's denial of Hillcrest's motion for a new trial, an order *denying* a new trial is not appealable. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 123, p. 188.)

[6] Pursuant to Government Code section 68081, we notified the parties prior to oral argument of our concerns with respect to appealability.

As indicated, on July 7, 2000, the trial court entered an order determining the $29,500 settlement between O'Hearn and defendants Direct Marketing and Gardner to be in good faith. Hillcrest did not seek review of that determination by way of a petition for writ of mandate. (§ 877.6, subd. (e).)[7] Thereafter, the matter proceeded to a jury trial on O'Hearn's cause of action against Hillcrest. O'Hearn obtained a judgment on general verdict against Hillcrest. Hillcrest now seeks, on its appeal from the judgment, appellate review of the earlier order approving the good faith settlement between O'Hearn and Direct Marketing and Gardner. However, that order is no longer reviewable.

"Any party wishing to challenge the merits of a 'good faith settlement' determination must do so via a petition for writ of mandate in the manner and within the time prescribed by section 877.6, subdivision (e). [Citations.] In particular, an aggrieved party may not forgo writ review and seek instead to have the determination reviewed for the first time in an appeal from the final judgment arising out of the trial of the plaintiff's claims against the nonsettling defendants." (*Main Fiber Products, Inc. v. Morgan & Franz Ins. Agency* (1999) 73 Cal.App.4th 1130, 1136–1137 [87 Cal.Rptr.2d 108] (*Main Fiber*); contra, *Maryland Casualty Co. v. Andreini & Co.* (2000) 81 Cal.App.4th 1413, 1423 [97 Cal.Rptr.2d 752] [§ 877.6, subd. (e) does not foreclose postjudgment review of good faith settlement determination]; *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 636 [103 Cal.Rptr.2d 480] [same].)

The rationale for prompt writ review is that it advances the strong policy of the law to encourage settlements. (See *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 494 [213 Cal.Rptr. 256, 698 P.2d 159].) " ' "[I]f a settlement is approved but ultimately held, on appeal after the judgment, to have been in bad faith, the case will have to be re-tried to include the alleged tortfeasors who were improperly removed from the case. Appellate review delayed until after the judgment thus thwarts the policy of the law to encourage settlement." ' " (*Main Fiber, supra,* 73 Cal.App.4th at p. 1136.)

■ We agree with *Main Fiber* that the lack of early finality would have a chilling effect on good faith settlements. We make the additional observation that if an appellant could await the appeal from the final judgment to attack

---

[7] Section 877.6 provides in relevant part at subdivision (e): "When a determination of the good faith or lack of good faith of a settlement is made, any party aggrieved by the determination may petition the proper court to review the determination by writ of mandate. The petition for writ of mandate shall be filed within 20 days after service of written notice of the determination, or within any additional time not exceeding 20 days as the trial court may allow."

an earlier order approving a good faith settlement, a settling defendant would be left in a precarious situation. A defendant may enter into a good faith settlement, obtain the trial court's imprimatur on the settlement and pay the settlement amount, but years later, following an appellate reversal, the settling defendant would be drawn back into the case. In the meantime, the settling defendant, having been dismissed from the action, would not have engaged in any discovery. During that interval, memories may fade and evidence may disappear. An appellate reversal of the good faith determination would thrust the settling defendant back into the litigation, now placed in the untenable position of having to defend the action without having preserved evidence through discovery. Therefore, without an assurance of swift finality, it would be risky for a defendant to enter into a good faith settlement, especially at an early stage of the proceedings. We conclude the strong policy of encouraging settlements militates against an interpretation of section 877.6, subdivision (e) which denies early finality to a good faith settlement determination.

■ Accordingly, we agree with *Main Fiber* that a party wishing to challenge the merits of a good faith settlement determination must do so by way of a petition for writ of mandate in accordance with section 877.6, subdivision (e), and may not seek to have the determination reviewed for the first time on the appeal from the final judgment following the trial of the plaintiff's claims against the nonsettling defendants. (*Main Fiber, supra,* 73 Cal.App.4th at pp. 1136–1137.) Here, Hillcrest did not seek writ review of the good faith settlement determination and that ruling is not reviewable at this juncture.[8][9]

Therefore, the issues on appeal are limited to Hillcrest's contentions with respect to the judgment on general verdict obtained by O'Hearn.

---

[8] There is a possible exception to the rule denying appellate review of a good faith settlement determination (see *Main Fiber, supra,* 73 Cal.App.4th at p. 1137, fn. 4), but in any event, it has no application here. *Wilshire Ins. Co. v. Tuff Boy Holding, Inc., supra,* 86 Cal.App.4th at pages 634–637, allowed appellate review of the trial court's good faith settlement determination because the appellant filed a timely petition for writ review and the petition was summarily denied. In the instant case, however, Hillcrest did not seek writ review in the first instance.

[9] Given the posture of this case, we do not address the impact of section 877.6, subdivision (e) when a subsequently added defendant seeks to attack a good faith settlement determination.

2. *The Tennessee and Florida settlements obtained by O'Hearn were irrelevant and should have been excluded; on this record it is reasonably probable that a result more favorable to Hillcrest would have been reached in the absence of the error.*

   a. *Trial court's ruling.*

The trial court's tentative decision to admit O'Hearn's evidence of other settlements, which ultimately became its final ruling, reveals the trial court's reasoning. The trial court observed: "As I said before, I don't think this [is the] type of evidence that is referred to when they prohibit evidence of prior attempts to settle a case. That is not the case. I think if this evidence is to be excluded it would be pursuant to [an Evidence Code section] 352 kind of an analysis wherein the court would weigh the prejudice to the party seeking to exclude it, undue consumption of time, confusion of the issues against the probative value analysis.

" . . . At this point in time it strikes me that it is probably admissible. The complexity of it, the difficult issues that it raises, you know, relating to statutory attorney's fees, punitive damages, indemnity, the fact that you are talking about laws from another state, those are real, but the question is are they of such, talking about the type of prejudice to the defense or the consumption of time when weighed against their relevance. My . . . feeling [is] that it is not."

   b. *Standard of review of claim of erroneous admission of evidence.*

Our review is guided by Evidence Code section 353, which provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

■ In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is *reasonably probable* that a result more favorable to the appealing party would have been reached in the absence of the error. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528 728 P.2d 1163]; *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170 [89 Cal.Rptr.2d 737].)

   c.  *The Tennessee and Florida settlements were irrelevant to establish O'Hearn's damages in this case and should have been excluded.*

Relevant evidence means evidence which has a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210.)

Here, the amounts of the Tennessee and Florida settlements had no relevance to the damages sustained by O'Hearn as a consequence of the instant unauthorized use of his likeness. As stated in *Southern Pac. Transp. Co. v. Veliz* (1977) 117 Ariz. 199 [571 P.2d 696], "offers of settlements of similar claims with other parties, even if arising out of the same fact situation, are inadmissible and irrelevant. [Citation.] . . . There may have been many reasons why petitioner settled other cases for various amounts, and we do not see the relevancy of those settlements to this litigation." (*Id.*, 571 P.2d at p. 697.)

For example, the substantive law in Tennessee and Florida would certainly have affected those settlement figures and may well be different from California law. In one of those cases, O'Hearn was seeking punitive damages. To the extent punitive damages were potentially recoverable there, that would have been a factor calculated into the parties' settlement considerations.[10]

As Hillcrest forcefully argues in its brief, the Tennessee and Florida settlements were irrelevant to the issue herein, namely, the value of the use of O'Hearn's image by Hillcrest in the Bonus Saver coupon book. O'Hearn's burden at trial was to establish the value of the use of his image in this fact situation, not how much other defendants paid to settle other lawsuits. As in any lawsuit, various factors may have motivated the parties to settle the Tennessee and Florida matters, including the substantive law in those jurisdictions, the role of insurers, the particular facts of those lawsuits and even the personalities of the individuals involved in those negotiations. An understanding of the factors that motivated those settlements would have required a mini-trial on those unrelated claims, resulting in an undue consumption of time, and even then, those settlement figures would have had little bearing on O'Hearn's damages in this case.

In sum, the Tennessee and Florida settlements were irrelevant and the trial court erred in admitting them over Hillcrest's objection.

---

[10] Although Civil Code section 3344, subdivision (a), authorizes recovery of punitive damages, O'Hearn did not seek punitive damages herein.

> d. *Viewing the record as a whole, the error was prejudicial; it is reasonably probable that a verdict more favorable to Hillcrest would have been reached absent the error.*

On this record, the trial court's erroneous admission of evidence of the Tennessee and Florida settlements was prejudicial.

The jury awarded O'Hearn $144,000 for the nine months that the Bonus Saver ad ran, which amounts to $16,000 per month. The evidence which was properly admitted shows that O'Hearn is compensated in that range only for product endorsements, not for other types of modeling. For example, O'Hearn's contract with Bodyonics, a vitamin and nutritional supplement company, which paid him an average of $19,760 per month, required him to "use his best efforts to endorse, advertise and promote the Products and corporate image of Bodyonics" at all public events attended by him, to wear hats, shirts or other apparel bearing Bodyonics' insignia at such engagements, to write a "regular bodybuilding and sports nutrition column for publication in Bodyonics' newsletters," to "attend and work full time in a booth maintained by Bodyonics at trade shows or other events," and to regularly attend store openings of GNC, Great Earth and related stores. In that contract, O'Hearn also agreed to give Bodyonics the right to utilize his "name, signature, endorsement, voice, photograph and likeness . . . in printed, audio, film and video formats of every description now or hereafter known or created." Similarly, O'Hearn's contract with Envision Marketing Group, for which he received $12,000 per month for seven months, required him to endorse nutritional supplements. These product endorsement contracts demanded far more of O'Hearn on a ongoing basis than the use of a single photograph of him in the Bonus Saver coupon book.

The evidence further showed that unlike product endorsements, other types of modeling work were less lucrative. For example, O'Hearn received about $5,000 for appearing on romance novel covers, not on a per book basis. For cover shots, sometimes he received nothing, sometime $300 or $500. Therefore, it is reasonably probable that absent the trial court's error in admitting the two out-of-state settlements, which settlements compensated O'Hearn at the rate of $37,500 per month for the unauthorized use of his image, the jury would have returned a lesser verdict. Accordingly, the matter must be remanded for a new trial as to damages.

3. *Remaining issues not reached.*

In view of the above, it is unnecessary to address Hillcrest's contention regarding the denial of its request for a midtrial continuance or any other issues.

## DISPOSITION

The appeal is dismissed insofar as it seeks review of the order determining good faith settlement or the order denying the motion for new trial. The judgment on general verdict is reversed and the matter is remanded for a new trial as to damages. Hillcrest shall recover costs on appeal.

Croskey, J., and Aldrich, J., concurred.

On February 18, 2004, the opinion was modified to read as printed above.