Filed 12/6/13  Franklin v. Bakersfield Mem. Hosp. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COURTNEY FRANKLIN, etc., et al.,<br>        Plaintiffs,<br><br>                v.<br><br>BAKERSFIELD MEMORIAL HOSPITAL,<br>        Defendant and Appellant;<br><br>PREMIER ANESTHESIA MEDICAL GROUP et al.,<br>        Defendants and Respondents. | F065620<br><br>(Super. Ct. No. S-1500-CV-271741)<br><br>**ORDER**<br>**MODIFYING OPINION AND DENYING**<br>**REQUEST FOR PUBLICATION**<br><br>**[No Change in Judgment]** |
| BAKERSFIELD MEMORIAL HOSPITAL,<br>        Petitioner,<br><br>                v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br>        Respondent;<br><br>PREMIER ANESTHESIA MEDICAL GROUP et al.,<br>        Real Parties in Interest. | F065401 |

**THE COURT:**

It is ordered that the opinion filed herein on November 20, 2013, be modified as follows:

1.   The paragraph commencing at the bottom of page 19 and ending at the top of page 20, second to last sentence beginning with "In the event," the words "in that amount" are deleted so the sentence reads:

In the event of a future claim by Nehemiah, BMH will be entitled to a credit against any judgment on that claim.

There is no change in judgment.  Except for the modification set forth, the opinion previously filed remains unchanged.

The request for publication of the opinion is hereby denied.  The opinion does not establish a new rule of law, nor does it meet any of the other criteria set forth in California Rules of Court, rule 8.1105(c).

In compliance with California Rules of Court, rule 8.1120(b), the Clerk/Administrator of this court shall transmit copies of the request for publication, the opinion, and this order to the Supreme Court.

_____

HILL, P. J.

WE CONCUR:

_____
LEVY, J.

_____
PEÑA, J.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COURTNEY FRANKLIN, etc., et al.,<br>      Plaintiffs, | F065620 |
| v. | (Super. Ct. No. S-1500-CV-271741) |
| BAKERSFIELD MEMORIAL HOSPITAL,<br>      Defendant and Appellant;<br><br>PREMIER ANESTHESIA MEDICAL GROUP et al.,<br>      Defendants and Respondents. | **OPINION** |
| BAKERSFIELD MEMORIAL HOSPITAL,<br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br>      Respondent;<br><br>PREMIER ANESTHESIA MEDICAL GROUP et al.,<br>      Real Parties in Interest. | F065401 |

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.  ORIGINAL PROCEEDINGS; petition for writ of mandate.

 Grienes, Martin, Stein & Richland, Robert A. Olson, Lara M. Krieger; Fonda & Fraser, Stephen C. Fraser, John Aitelli and Daniel K. Dik for Defendant and Appellant and for Petitioner.

LeBeau-Thelen, Dennis R. Thelen, W. Steven Shayer; Cole Pedroza, Kenneth R. Pedroza and Cassidy C. Davenport for Defendants and Respondents and for Real Parties in Interest.

No appearance for Respondent The Superior Court of Kern County.

-ooOoo-

By appeal and petition for writ of mandate, defendant, Bakersfield Memorial Hospital (BMH), challenges the trial court's determination that the settlement of defendants, Dr. Narendra Raval and Premier Anesthesia Medical Group (Premier), with plaintiff and other claimants was made in good faith. BMH contends the settlement amount was disproportionately low in comparison with Dr. Raval's degree of liability; it further contends the settlement of Nehemiah Franklin's potential future claim was improper, because Nehemiah had no viable claim at the time of the settlement. We conclude the trial court applied the proper test and did not abuse its discretion in determining the settlement was made in good faith. In light of the facts and circumstances of this case, the settlement of Nehemiah's potential claim was proper. Permitting the good faith settlement of the potential claim promotes the policy of encouraging settlement by allowing Dr. Raval and Premier to buy their peace and by bringing finality to the case, without unfairly disadvantaging BMH. Accordingly, we affirm the judgment and deny the writ.

### FACTUAL AND PROCEDURAL BACKGROUND

Courtney Franklin and her son, Nehemiah, through their guardian ad litem, Pamela Gatewood (Courtney's mother), sued an anesthesiologist, Dr. Raval, his medical group, Premier, and BMH, for medical malpractice arising out of events that occurred during the delivery of Nehemiah.[1] About 10 minutes after Dr. Raval administered an epidural to

---

[1] We refer to some of the individuals involved by their first names for convenience, because they share a last name. No disrespect is intended.

2

Courtney, her blood pressure dropped and she became drowsy; a few minutes later, she was asleep and could not be roused. She stopped breathing and had no pulse; the nurse initiated a "code blue." Dr. Raval asked the nurses for resuscitation instruments, including an oral airway, Ambu bag, and laryngeal mask airway (LMA). Because Courtney was an adult patient, he expected adult-sized equipment. The nurses looked in the crash cart next to the bed, but could not find adult-sized equipment. They gave Dr. Raval pediatric equipment. Dr. Raval used the pediatric equipment to ventilate the patient. The baby was subsequently delivered by Cesarean section. A nurse who went back in the room after Courtney had been taken from it found the epidural cart was still in the room, with an adult-sized Ambu bag hanging from it in plain sight and an adult-sized LMA in the drawer. One nurse opined that, in the commotion, which included Courtney's mother becoming hysterical, the nurses overlooked the epidural cart, which had been pushed into a corner. A neurologist later concluded Courtney suffered a brain injury from a hypoxic episode.

Nehemiah's complaint was voluntarily dismissed without prejudice, apparently based on an expert's report opining that he "sustained minimal to no injury from his mother's cardiorespiratory arrest during her labor with him." Subsequently, during mediation, all parties reached a settlement of the action. The total settlement amount was $5 million, with BMH contributing $3 million and Dr. Raval contributing $2 million. Premier settled for a waiver of costs. The settlement amount was allocated among Courtney and other claimants. Of the $2 million contributed by Dr. Raval, $250,000 went to Nehemiah for a release of his potential medical malpractice claims. Of the remaining $4.75 million, $4 million went to Courtney for her injuries, $500,000 went to Gatewood for out-of-pocket medical expenses and expenses of caring for Courtney and her children, and $250,000 was divided equally among Nehemiah and his two siblings,

Heaven Guess and Damon Franklin, for their potential wrongful death claims. The settlement was not conditioned on a finding of good faith in favor of any defendant.

The trial court approved the compromise of the claims of Courtney and the minors. Dr. Raval and Premier moved, pursuant to Code of Civil Procedure sections 877 and 877.6,[2] for a determination that their settlement with the claimants was in good faith and barred indemnity claims by BMH. The trial court granted the motion and BMH appeals.

## *DISCUSSION*

### I. Appealability

There is a conflict in the cases concerning whether a determination of the good faith of a settlement is appealable after judgment is entered or may only be reviewed by petition for writ of mandate filed immediately after entry of the order. (Compare *Main Fiber Products, Inc. v. Morgan & Franz Ins. Agency* (1999) 73 Cal.App.4th 1130, 1135-1136 and *O'Hearn v. Hillcrest Gym & Fitness Center, Inc*. (2004) 115 Cal.App.4th 491, 498-499 with *Maryland Casualty Co. v. Andreini & Co*. (2000) 81 Cal.App.4th 1413, 1420-1425 and *Wilshire Ins. Co. v. Tuff Boy Holding, Inc*. (2001) 86 Cal.App.4th 627, 634-637.) We need not resolve the conflict. BMH has filed both a timely writ petition and a timely appeal from the judgment, in which it challenges the determination of good faith, and the proceedings have been consolidated. We address the merits of the issues presented.

### II. Good Faith Determination

"Any party to an action in which it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or

---

**2** All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

4

more alleged tortfeasors or co-obligors." (§ 877.6, subd. (a)(1).) "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (*Id.,* subd. (c).) "The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counter affidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing." (*Id.,* subd. (b).)

### A. Standard of review

Section 877.6 grants the trial court broad discretion in determining whether a settlement is in good faith for purposes of that statute, and "its decision may be reversed only upon a showing of abuse of discretion." (*TSI Seismic Tenant Space, Inc. v. Superior Court* (2007) 149 Cal.App.4th 159, 165 (*TSI Seismic*).) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.) "We reverse the judgment only if in the circumstances of the case, viewed most favorably in support of the decision, the decision exceeds 'the bounds of reason' [citation], and therefore a judge could not reasonably have reached that decision under applicable law. [Citations.] It is the appellant's burden on appeal to show the trial court abused its discretion. [Citation.]" (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 957.)

### B. Burden of proof

In the trial court, "[t]he party asserting the lack of good faith shall have the burden of proof on that issue." (§ 877.6, subd. (d).) The party seeking a determination of good

faith may file a "bare bones" motion, stating the grounds on which the determination is sought and supporting the motion with a declaration setting forth a brief background of the case and the settlement terms. (*City of Grand Terrace v. Superior Court* (1987) 192 Cal.App.3d 1251, 1261.) The moving party need not address all the factors relevant to the determination of good faith. (*Id*. at p. 1258.) The party challenging the good faith of the settlement bears the burden of presenting evidence demonstrating that the settlement is not in good faith. (*Id*. at pp. 1261-1262.) The moving party may then file responsive declarations or other evidence negating the asserted lack of good faith. (*Id*. at p. 1262.)

### C. *Use of wrong legal standard*

BMH contends the trial court applied the wrong legal standard because, during oral argument, it stated that a plaintiff could pick and choose among defendants in settling. The court's statements prior to entering its final judgment, whether expressed orally in court or in a written tentative decision, are not the judgment and may not be used to impeach the judgment. (*Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 199; *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646-647.) A trial court may enter an order or judgment wholly different from that previously announced. (*Ditto,* at p. 646; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1170.) "[T]he trial court may properly file a written order differing from its oral rulings when the rulings have not been entered in the minutes of the court. [Citation.] Furthermore, when the trial court's minute order expressly indicates that a written order will be filed, only the written order is the effective order." (*Drake,* at p. 1170.) "[W]hether the trial court in its intended decision made an alleged error of law or fact, the intended decision remains only an intended decision. It is the statement of decision and judgment which allow the trial court to rectify any errors." (*Ditto,* at p. 648.)

The statements of the trial court at the hearing do not constitute the final ruling or decision of the court; they are not the order under review. The formal order entered by

6

the court does not contain any reference to picking and choosing among defendants. It does not indicate the trial court applied the wrong test in determining whether the settlement was entered into in good faith. On the contrary, it reflects that the trial court properly determined whether the settlement met the criteria for good faith set out in *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 (*Tech-Bilt*), including whether the settlement was within the reasonable range of Dr. Raval's and Premier's share of the potential liability, considering the facts and circumstances of this case.

In any event, the trial court was correct that plaintiffs may choose with which defendants they wish to settle; the settlement may be found to be in good faith, so long as the *Tech-Bilt* criteria are met. Specifically, the settlement may be found to be in good faith where there was no collusion between the settling parties and the amount of the settlement was "'within the "reasonable range" of the settling party's proportionate share of comparative liability'" for the alleged injuries. (*Long Beach Memorial Medical Center v. Superior Court* (2009) 172 Cal.App.4th 865, 872 (*Long Beach Memorial*).) There was no evidence of collusion, and the trial court properly applied the "reasonable range" test in determining whether the settlement was in good faith.

### D.  *Dr. Raval's settlement*

In determining the issue of the good faith of a settlement, the question for the trial court is "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Tech-Bilt, supra,* 38 Cal.3d at p. 499.) A number of factors are considered in making this determination, including: "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant

7

considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." (*Ibid*.) A settlement is not in good faith if it "is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." (*Id*. at pp. 499-500.) "The dual equitable goals of section 877.6 are 'equitable sharing of costs among the parties at fault and encouragement of settlements. [Citation.]' [Citation.]" (*Long Beach Memorial, supra,* 172 Cal.App.4th at p. 872.)

The evaluation of the settlement must be made on the basis of information available at the time of settlement; the settlement amount "'must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' [Citation.]" (*Tech-Bilt, supra*, 38 Cal.3d at p. 499.)

Raval and Premier filed a motion for the determination of the good faith of their settlement with plaintiff and other claimants, supported by declarations and exhibits setting out the nature of the claims being settled and the terms of the settlement. BMH filed an opposition brief, supported by a declaration which merely identified two attached documents: BMH's opposition to the claimants' petitions to approve their compromises and plaintiffs' statement of damages. In its opposition to the good faith motion, BMH did not dispute the sufficiency of the overall amount of the settlement ($5 million from Raval and BMH). Rather it contested the propriety of Dr. Raval's $250,000 settlement of Nehemiah's potential medical malpractice claims and, as to the remaining $4.75 million, challenged the percentage of the whole paid by Dr. Raval, contending it was less than his proportionate share of the total settlement. BMH argued that Dr. Raval paid only 37 percent of the $4.75 million, while BMH paid 63 percent; it contended Dr. Raval's responsibility was "at least coextensive with" BMH's.

8

Applying the *Tech-Bilt* factors, we note BMH does not contend Dr. Raval engaged in any collusion, fraud, or tortious conduct in reaching his settlement with the claimants.

Regarding the "rough approximation of plaintiff's total recovery" (*Tech-Bilt, supra*, 38 Cal.App.4th at p. 499), there was no evidence of Courtney's probable recovery if she prevailed at trial, but BMH does not contend the total settlement amount was too low. BMH submitted plaintiffs' statement of damages, in which Courtney and Nehemiah sought "[n]on-economic damages in an amount of $15 million, per plaintiff, per defendant, per cause of action,"[3] and economic damages "in excess of $15 million." The settlement amount is not compared with the amount sought in plaintiff's complaint or statement of damages, however, but with the probable recovery if plaintiff prevails at trial. (*Tech-Bilt,* at p. 501.) There is no dispute that the overall settlement amount was appropriate.

Dr. Raval's settlement equaled the $2 million limit on his insurance policy. Although Premier had a separate policy with a $2 million limit, there was no allegation Premier was separately liable for claimants' injuries; it was merely vicariously liable for the conduct of Dr. Raval. Other than the limits of Dr. Raval's insurance policy, BMH presented no evidence of Dr. Raval's financial condition or ability to respond to claimants' demands for damages.

Regarding the rough approximation of the settling party's proportionate liability, the evidence before the trial court included the following: Shortly after Dr. Raval placed the epidural, Courtney's blood pressure dropped, she stopped breathing, and her heart stopped. Dr. Raval asked for the equipment necessary to ventilate her, but the nurses in the room could not locate adult-sized equipment. The crash cart that had been brought

---

**3**      Plaintiffs noted in the statement of damages that they "assert that MICRA is unconstitutional." (See Civ. Code, § 3333.2 [part of the Medical Injury Compensation Reform Act of 1975 (MICRA) which limits recovery of noneconomic damages in medical malpractice actions to $250,000].)

into the room was a pediatric crash cart. After a search, the nurses presented Dr. Raval with pediatric equipment; he asked for adult equipment, but he was not given any. He successfully used the pediatric equipment to ventilate the patient. The baby was subsequently delivered by Cesarean section. The hospital staff later discovered that an adult-sized Ambu bag and LMA were on the epidural cart that had been in the corner of the room at the time Dr. Raval asked for that equipment. The epidural cart was BMH's, but Dr. Raval would have brought it into the room with him. The crash carts and epidural carts were stocked by hospital staff; the nurses were responsible for making sure crash carts contained the proper equipment, readily accessible, for emergencies. That would include an adult Ambu bag. BMH presented no evidence Dr. Raval was negligent in the placement of the epidural, and no evidence of the cause of Courtney's sudden change of condition. The theory of liability against all defendants appears to be that the delay in getting oxygen to Courtney, caused by the delay in getting the resuscitation equipment to Dr. Raval, resulted in Courtney's injuries.

BMH argued that Dr. Raval was primarily, or at least equally, liable for Courtney's damages. He was in charge of the patient, administered the epidural, knew the epidural cart, which he took with him from room to room, was in Courtney's room at all times, with an adult-sized Ambu bag and mask on it, and failed to direct the nurses to it. BMH asserted Dr. Raval "was the 'captain of the ship,' legally responsible for the performance of everyone in the room, including the hospital's staff during the procedure." As such, his liability encompassed that of the staff, so it could not be less than 50 percent.

"The 'captain of the ship' doctrine imposes liability on a surgeon under the doctrine of respondeat superior for the acts of those under the surgeon's special supervision and control during the operation." (*Baumgardner v. Yusuf* (2006) 144 Cal.App.4th 1381, 1396.) Although a physician is not ordinarily liable for acts of

10

hospital staff, such as nurses, who are not his employees, "'"'" if the physician has the right to exercise control over the work to be done by the hospital employee and the manner of its performance, or an employee of a hospital is temporarily detached in whole or in part from the hospital's general control so as to become the temporary servant of the physician he assists, the physician will be subject to liability for the employee's negligence. [¶] Thus, where a hospital employee, although not in the regular employ of an operating surgeon, is under his special supervision and control during the operation, the relationship of master and servant exists, and the surgeon is liable, under the doctrine of respondeat superior, for the employee's negligence.…"' [Citation.]" (*Ibid*., italics omitted.) Even where a surgeon is liable on a "captain of the ship" theory, however, the hospital is not necessarily absolved of all liability. (*Ibid*.) In *Truhitte v. French Hospital* (1982) 128 Cal.App.3d 332, for example, the trial court granted a judgment notwithstanding the verdict and held the defendant surgeon solely liable for leaving a sponge in the patient after an operation. The appellate court reversed, concluding that even though the surgeon had a nondelegable duty to remove all the sponges, "it does not follow that the hospital may escape liability for its independent negligence in failing to devise adequate sponge-accounting procedures or in negligently carrying out such procedures through its employee-nurses." (*Id*. at p. 349.)

Additionally, a party who is vicariously liable for the tortious act of another is liable only to the same extent as the party who committed the tortious act. (See Rest.3d Torts, Apportionment of Liability, § 13, com. d & e, p. 114.) "A vicariously liable party has the right to pursue indemnity against the primary tortfeasor." (*GuideOne Mutual Ins. Co. v. Utica National Ins. Group* (2013) 213 Cal.App.4th 1494, 1504; accord, Rest.3d Torts, Apportionment of Liability, § 22.) Thus, although the "captain of the ship" doctrine may make a physician vicariously liable to the injured patient for the conduct of hospital staff under his supervision and control, the doctrine does not negate the liability

11

of the hospital.  Further, it defines the liability of parties to the injured plaintiff; it does not address issues of comparative negligence or indemnity between defendants.

In determining whether the settlement amount bears a reasonable relationship to the settling party's proportionate share of liability, the court "must … consider the culpability of the tortfeasor vis-à-vis other parties alleged to be responsible for the same injury.  Potential liability for indemnity to a nonsettling defendant is an important consideration for the trial court in determining whether to approve a settlement by an alleged tortfeasor.  [Citation.]" (*TSI Seismic, supra*, 149 Cal.App.4th at p. 166.) Likewise, the settling tortfeasor's right to indemnity from other parties allegedly responsible for the claimant's injuries must be taken into account.  In determining relative liability, it appears any liability of Dr. Raval as "captain of the ship" would be offset by his right to indemnity from those primarily liable.[4]

BMH argues a greater proportion of the potential liability was attributable to Dr. Raval than to the hospital and its staff.  Substantial evidence supports the trial court's implied finding to the contrary.  Dr. Raval brought the epidural cart into the room, and it contained an adult-sized Ambu bag in plain sight.  When the emergency arose, Dr. Raval remained with the patient at all times.  The hospital staff brought in a crash cart, but it was a pediatric crash cart, which did not contain adult-sized equipment for ventilating the patient.  The hospital staff was responsible for ensuring that a properly equipped crash cart was accessible in case of emergency.  When Dr. Raval demanded an adult-sized Ambu bag and other equipment, the nurses could not find it on the crash cart and did not look for it on the epidural cart.  BMH blames Dr. Raval for not telling the nurses to obtain the equipment from the epidural cart, but at least one nurse was aware that the anesthesiologist took the epidural cart from room to room with him, so she should have

_____

[4]    In light of this conclusion, we need not decide whether the "captain of the ship" doctrine actually applies to an anesthesiologist under these circumstances.

12

known it was in the room at the time.  Apparently, the epidural cart had been pushed into a corner and the nurses overlooked it.

These facts do not establish as a matter of law that Dr. Raval's proportionate share of the potential liability was so much greater than BMH's that he should have borne a significantly larger share of the total potential liability than BMH.

The final *Tech-Bilt* factor we must consider is the amount paid in settlement. BMH does not challenge the total amount of the settlement.  It challenges the percentage of the total that was paid by Dr. Raval as too small in comparison with his share of liability.  Dr. Raval paid a total of $2 million to settle the claims of all claimants.  BMH paid $3 million to settle the claims of all claimants, except the claim of Nehemiah for any personal injuries he might develop or discover in the future arising out of defendants' alleged medical malpractice.  Comparing these amounts, Dr. Raval paid 40 percent of the total and BMH paid 60 percent.  BMH asserts the appropriate comparison is between its $3 million payment and Dr. Raval's payment of $1.75 million to settle all but Nehemiah's separate medical malpractice claim, because BMH's settlement did not include that claim.  Even if we consider only those amounts, Dr. Raval contributed approximately 37 percent and BMH contributed approximately 63 percent to the settlement.

BMH contends Dr. Raval was at least equally responsible with BMH for Courtney's injuries.  BMH has not demonstrated that, although 50 percent of the potential liability is admittedly within the ballpark of Dr. Raval's proportionate share of liability, 40 percent or 37 percent is not.  "In the end, '[t]he ultimate determinant of good faith is whether the settlement is grossly disproportionate to what a reasonable person at the time of settlement would estimate the settlor's liability to be.'  [Citation.]  '[A] "good faith" settlement does not call for perfect or even nearly perfect apportionment of liability.  In order to encourage settlement, it is quite proper for a settling defendant to pay less than

13

his proportionate share of the anticipated damages.  What is required is simply that the settlement not be grossly disproportionate to the settlor's fair share.'  [Citation.]" (*PacifiCare of California v. Bright Medical Associates, Inc.* (2011) 198 Cal.App.4th 1451, 1465.)

In light of all the evidence presented in the trial court concerning how Courtney's injuries occurred, which does not demonstrate that Dr. Raval was significantly more negligent or more responsible for Courtney's injuries than BMH, and all of the *Tech-Bilt* factors, we do not believe that Dr. Raval's payment of 40 or 37 percent of the potential liability is "'grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate [Dr. Raval's] liability to be'" or "so far 'out of the ballpark' … as to be inconsistent with the equitable objectives of the [good faith settlement] statute." (*Tech-Bilt, supra*, 38 Cal.3d at pp. 499-500).  Accordingly, the trial court did not abuse its discretion in determining Dr. Raval's settlement with the claimants was in good faith.

### E.     Premier's settlement

Premier settled with claimants for a waiver of costs, which amounted to $9,022. BMH contends Premier was jointly and severally liable with Dr. Raval for the claimant's losses, but it paid nothing to settle those claims, even though it had a $2 million insurance policy of its own.  The evidence demonstrated that Premier was a partnership and Dr. Raval was a partner in it.  Generally, a partnership is liable for an injury to a third person that results from the wrongful act or omission of a partner acting in the course of business of the partnership, but the partnership is entitled to seek indemnity from the partner whose negligence caused the loss.  (Corp. Code, § 16305, subd. (a); *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1551.)  There was no evidence that Premier could be held liable to the claimants on any basis other than its vicarious liability for the acts of its partner, Dr. Raval.  Thus, Premier's potential liability

14

was coextensive with that of Dr. Raval. Consequently, if, as we have concluded, Dr. Raval's payment of $2 million was sufficient for a good faith resolution of his liability to the claimants (i.e., in the ballpark), it was also sufficient to resolve the identical liability of Premier. No further contribution from Premier was required. The trial court did not abuse its discretion in determining the good faith of Premier's settlement.

### F. Settlement of Nehemiah's potential claims

BMH challenges the good faith of the settlement on the ground it included a payment of $250,000 to Nehemiah for his prospective medical malpractice claims for injuries that have not yet manifested themselves. It argues Nehemiah dismissed his complaint before the settlement, so at the time of the settlement there was no allegation he was injured by the tort of joint tortfeasors. BMH asserts the trial court did not have jurisdiction to adjudicate the good faith of the settlement of "inchoate, hypothetical claims that might arise in the future from a currently nonexistent dispute." (Capitalization omitted.)

Section 877.6 provides: "Any party to an action in which it is alleged that two or more parties are joint tortfeasors … shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the *plaintiff or other claimant* and one or more alleged tortfeasors." (§ 877.6, subd. (a)(1), italics added.) The statute does not require that the claimant be a party to the pending action or that the tort allegations be made by the claimant in a pending action. (See *County of Los Angeles v. Guerrero* (1989) 209 Cal.App.3d 1149, 1154-1155 [concluding a settlement entered into prior to the filing of any action may later be determined to be in good faith]; *Mid-Century Ins. Exchange v. Daimler-Chrysler Corp.* (2001) 93 Cal.App.4th 310, 316 [concluding an individual was an alleged joint tortfeasor because of his ownership of the car by which the injured party was injured, even though his insurer settled with the injured party without litigation or a

15

formal claim].)  Here, Dr. Raval and Premier were parties to an action in which it was originally alleged that they and BMH were jointly liable for tortiously causing injuries to Courtney and Nehemiah.  The allegedly negligent medical care that was the subject of the case was rendered to Courtney while she was in labor with Nehemiah.  Thus, any negligence may have affected both Courtney and Nehemiah.[5]  Dr. Raval and Premier, alleged joint tortfeasors with BMH, settled with Courtney, the only plaintiff at the time of the settlement, and with other claimants (Nehemiah, Heaven, and Damon), and sought a determination of the good faith of that settlement.  Under section 877.6, Dr. Raval and Premier were entitled to a hearing to determine the good faith of the settlement, despite the fact that Nehemiah, Heaven, and Damon were not parties to the action, but mere "claimants."

BMH argues that, at the time of the settlement, Nehemiah was not even a claimant, because he had dismissed his action after an expert opined he had sustained minimal to no injury as a result of his mother's cardiorespiratory arrest during labor.  Because he was not injured, BMH concludes, Nehemiah had no claim to settle.  But the allegations of defendants' negligence during Courtney's labor remained, as well as the possibility that Nehemiah may manifest an injury as he grows older.

Applying BMH's reasoning, Nehemiah, Heaven, and Damon would not be claimants in connection with their potential claims for the wrongful death of their mother, because those claims were also inchoate, potential, future claims, rather than current, existing claims.  Their mother is still alive, and there are no wrongful death allegations in the complaint.  BMH does not challenge the propriety of the settlement of the potential wrongful death claims, however.  In fact, BMH's own settlement with Courtney and the other claimants included payments to Nehemiah, Heaven, and Damon for their potential

---

[5]    We note the expert's report indicates Nehemiah experienced neonatal seizures shortly after birth.

16

wrongful death claims. BMH impliedly represented to the court, in its application for a determination of the good faith of its settlement, that the settlement of those claims was in good faith and appropriate for such a determination.

BMH attempts to distinguish the wrongful death claims from Nehemiah's potential personal injury claim on the ground the wrongful death claims are derivative of Courtney's claim while Nehemiah's personal injury claim is not. In addition to the inaccuracy of the characterization of wrongful death claims as derivative of the decedent's claims,[6] we fail to see why claims that are potential and not currently actionable should be legally cognizable for purposes of good faith settlement when they are derivative of someone else's claims, but not when they are the claimant's own direct claims.

Under BMH's theory, an alleged joint tortfeasor could never entirely buy its peace as long as someone had a potential claim that had not yet ripened into an actual claim. For example, an alleged joint tortfeasor could not settle potential wrongful death claims in good faith, but would have to wait until they matured into actual claims upon the death of the injured party. The uncertainties caused by such a rule would discourage settlements. Where the facts indicate a claimant may have a claim in the future, we believe the likelihood that the potential claim may ripen into an actual claim, like the likelihood that any particular alleged joint tortfeasor will be found liable for a portion of the claimant's loss, is a factor to be considered in determining whether the settlement is in good faith.

---

**6** "'Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 "creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.]" [Citations.]' [Citation.]" (*Boeken v. Philip Morris USA Inc*. (2013) 217 Cal.App.4th 992, 997.)

17

Here, Nehemiah had a potential claim for personal injury due to medical negligence, just as he, Heaven, and Damon had a potential claim for their mother's wrongful death. The evidence showed Courtney went into cardiorespiratory arrest during labor; there was a delay in obtaining and placing resuscitation instruments. Courtney sustained a brain injury; Nehemiah experienced neonatal seizures. Although the claimants' expert opined Nehemiah "sustained minimal to no injury," he also acknowledged Nehemiah was only 15 months old at the time of his examination. Thus, while Nehemiah does not currently have evidence that he sustained more than a minimal injury from the occurrence alleged in the complaint, it is possible such an injury will develop or be discovered in the future. To buy their peace fully, Dr. Raval and Premier included such a potential claim in their settlement. We find nothing in section 877.6 that prevents settling parties from including in the settlement all of the settling tortfeasor's potential liability to the claimant arising out of the relevant events.

BMH contends that, if the trial court had jurisdiction to consider the good faith of the settlement of Nehemiah's potential personal injury claims, it abused its discretion by finding the settlement to be in good faith. It asserts Nehemiah settled his personal injury claims with Dr. Raval and Premier, but refused to settle them with BMH, leaving BMH "holding the bag" for a potentially large future claim. Although, in its briefs, BMH repeatedly states Nehemiah refused to settle his personal injury claim with BMH, it cites nothing in the record in support of that assertion, or the implication that Dr. Raval and Premier were involved in any such refusal. The declaration of counsel for Dr. Raval and Premier, filed in support of the good faith motion, states that "[t]he settlement … was obtained through arm's length negotiations with the assistance of the neutral mediator," who "handled the negotiations without direct communication between me and plaintiffs' counsel." The declaration also states counsel's understanding that his settlement was reached at the same time as BMH's. Thus, the record does not support BMH's

18

implication of wrongdoing in the settlement of Nehemiah's potential claims against Dr. Raval and Premier.

BMH also objects to the allocation of the settlement funds between Nehemiah's future claims and Courtney's claims. In the determination of the good faith of a settlement, the purpose of allocation is to determine the credit to be given to other alleged tortfeasors under section 877. (*L.C. Rudd & Son v. Superior Court* (1997) 52 Cal.App.4th 742, 752-753.) Section 877 provides that, "[w]here a release … is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, [¶] … it shall … reduce the claims against the [other such parties] in the amount stipulated by the release." (§ 877, subd. (a).) "The parameters of the 'ballpark' for the purpose of allocating the settlement proceeds between discrete claims are limited by evidence of the relation of the claims to the whole of the settlement amount." (*L.C. Rudd,* at p. 753.) The evidence disclosed that the value of Nehemiah's potential claim was small in relation to the other claims being settled and the total settlement amount. At the time of settlement, Nehemiah had exhibited minimal or no injury. Nonetheless, the parties allocated $250,000 to Nehemiah's potential claim.

BMH complains both that the amount allocated to Nehemiah's claim was too large, because the expert opined that he sustained minimal to no injury, and that it was too small, leaving BMH alone to face any large future claim Nehemiah might make. The determination of good faith must be based on the facts as they were known at the time of the settlement. (*Tech-Bilt, supra*, 38 Cal.3d at p. 499.) At the time of settlement, the expert's opinion indicated Nehemiah had sustained little or no injury from his mother's cardiorespiratory arrest during labor. Nonetheless, the settlement with Dr. Raval and Premier did not allocate a nominal sum to Nehemiah's potential personal injury claim. It assigned the claim a significant portion of the overall settlement amount. The allocation of $250,000 to Nehemiah's potential personal injury claim benefited BMH. Nehemiah's

19

future medical malpractice claim against BMH was the only claim not included in the settlements.  In the event of a future claim by Nehemiah, BMH will be entitled to a credit in that amount against any judgment on that claim.  Had a smaller amount been allocated to that claim, BMH's offset against any judgment would have been correspondingly smaller.

The evaluation of the settlement must be made on the basis of information available at the time of settlement.  (*Tech-Bilt, supra*, 38 Cal.3d at p. 499.)  In light of the facts known at the time of settlement and presented to the court in the motion for good faith determination, we conclude substantial evidence supports the trial court's finding that the allocation of funds to Nehemiah's potential claim for medical malpractice was in good faith.  The trial court did not abuse its discretion in concluding the settlement and its allocation to the claimants and their claims, was made in good faith.

## *DISPOSITION*

The writ petition is denied and the judgment is affirmed.  Premier and Dr. Raval are awarded their costs on appeal and in the writ proceeding.


_____
HILL, P. J.

WE CONCUR:


_____
LEVY, J.


_____
PEÑA, J.

20